<u>Attorney Grievance Comm'n v. Russell A. Neverdon, Sr.</u>, Misc. Docket AG No. 12, September Term, 2020

**ATTORNEY DISCIPLINE – SANCTIONS – SIX-MONTH SUSPENSION –** Court of Appeals suspended from practice of law in Maryland for six months Russell A. Neverdon, Sr., Respondent, with condition that upon reinstatement Respondent engage attorney monitor for period of one year.   Respondent, among other things, failed to properly supervise work of non-attorney assistant, failed to provide competent and diligent representation to clients in personal injury and estate matter, failed to adequately communicate with clients about matter, and failed to recognize and advise clients of conflict of interest and to attempt to obtain clients' informed consent, confirmed in writing, to continue with representation.   Such conduct violated Maryland Attorneys' Rules of Professional Conduct ("MARPC") 1.1 (Competence), 1.2(a) (Scope of Representation and Allocation of Authority Between Client and Attorney), 1.3 (Diligence), 1.4(a)(2) and (b) (Communication), 1.7 (Conflict of Interest), 1.15(a) and (d) (Safekeeping Property), 1.16(a)(1) (Declining or Terminating Representation), 5.3(b) (Responsibilities Regarding Non-Attorney Assistants), 5.5(a) (Unauthorized Practice of Law), 8.4(d) (Conduct that is Prejudicial to Administration of Justice), and 8.4(a) (Violating MARPC).

Circuit Court for Baltimore City
Case No. 24-C-20-002534

Argued: March 8, 2021

<u>IN THE COURT OF APPEALS</u>

<u>OF MARYLAND</u>

Misc. Docket AG No. 12

September Term, 2020

_____

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

RUSSELL A. NEVERDON, SR.

_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

_____

Opinion by Watts, J.

_____

Filed: May 28, 2021

This attorney discipline proceeding involves an attorney who mainly, among other things, failed to properly supervise the work of a non-attorney assistant, failed to provide competent and diligent representation to clients in a personal injury and estate matter, failed to adequately communicate with the clients about the matter, and failed to recognize and advise clients of a conflict of interest and to attempt to obtain the clients' informed consent, confirmed in writing, to continue with the representation.

Russell A. Neverdon, Sr., Respondent, a member of the Bar of Maryland, was retained by relatives of a person who was struck and killed by a motor vehicle to handle a personal injury (survival action) and an estate matter that arose as a result of the individual's death.  One of Neverdon's clients filed a complaint against him with Bar Counsel.

On May 19, 2020, on behalf of the Attorney Grievance Commission, Petitioner, Bar Counsel filed in this Court a "Petition for Disciplinary or Remedial Action" against Neverdon, charging him with violating Maryland Attorneys' Rules of Professional Conduct ("MARPC")[1] 1.1 (Competence), 1.2(a) (Scope of Representation and Allocation of Authority Between Client and Attorney), 1.3 (Diligence), 1.4 (Communication), 1.5(b) and (c) (Fees), 1.7 (Conflict of Interest), 1.8(b) (Conflict of Interest; Current Clients), 1.15(a), (d), and (e) (Safekeeping Property), 1.16(a)(1) (Declining or Terminating Representation), 3.3(a)(1) (Candor Toward the Tribunal), 5.3(b) and (c) (Responsibilities

---

[1]Effective July 1, 2016, the Maryland Lawyers' Rules of Professional Conduct ("MLRPC") were renamed the MARPC and relocated to Title 19 of the Maryland Rules, without substantive change.

Regarding Non-Attorney Assistants), 5.5(a) (Unauthorized Practice of Law), 8.1(a) (Bar Admission and Disciplinary Matters), 8.4(c) (Dishonesty, Fraud, Deceit, or Misrepresentation), 8.4(d) (Conduct that is Prejudicial to the Administration of Justice), and 8.4(a) (Violating the MARPC).

On May 22, 2020, this Court designated the Honorable Anthony F. Vittoria ("the hearing judge") of the Circuit Court for Baltimore City to hear this attorney discipline proceeding. On September 28, 29, 30, and October 5, 2020, the hearing judge conducted a hearing. On November 23, 2020, the hearing judge filed in this Court Findings of Fact and Conclusions of Law, determining that Neverdon had violated MARPC 1.1, 1.2(a)[2], 1.3, 1.4,[3] 1.5,[4] 1.7, 1.15(a), 1.15(d), 1.16(a), 1.16(d),[5] 3.3(a)(1), 5.3(b), 5.5(a), 8.1(a), 8.4(c), and 8.4(a), but had not violated MARPC 1.15(e), 5.3(c), or 8.4(d).[6]

On March 8, 2021, we heard oral argument. For the below reasons, based on the rule violations and the aggravating factors found herein, we suspend Neverdon from the

---

[2]Although the hearing judge did not specify a subsection, the hearing judge quoted MARPC 1.2(a).

[3]The hearing judge did not specify which subsection of MARPC 1.4 that Neverdon had violated.

[4]In his conclusions of law, the hearing judge quoted MARPC 1.5(a) and, without specifying a subsection, concluded that Neverdon violated MARPC "1.5 by taking his full fee before his work had been completed." Later, in the conclusion of the opinion, when summarizing the violations, the hearing judge stated that Neverdon had violated MARPC 1.5(a). Bar Counsel, however, charged Neverdon with violating MARPC 1.5(b) and (c), not MARPC 1.5(a).

[5]In the petition, Bar Counsel charged Neverdon with violating MARPC 1.16(a)(1). In the opinion, the hearing judge stated that Bar Counsel had charged Neverdon with violating MARPC 1.16(a) but had argued at the hearing that Neverdon violated MARPC 1.16(d).

[6]At the hearing, Bar Counsel withdrew the allegation that Neverdon had violated MARPC 1.8(b).

practice of law in Maryland for six months, with the condition that, upon reinstatement to the practice of law in Maryland, Neverdon engage an attorney monitor for a period of one year, with the attorney monitor to be approved by Bar Counsel and paid for by Neverdon.

## BACKGROUND

The hearing judge found the following facts, which we summarize.

On June 24, 1999, this Court admitted Neverdon to the Bar of Maryland.  At the time of the disciplinary hearing, Neverdon had been practicing law in Baltimore City for twenty-one years.  From April 2015 to March 2018, Neverdon worked full time as the Director of Special Services in the Office of the Secretary of the Department of Public Safety and Correctional Services ("DPSCS").  While holding the position, Neverdon maintained a law practice limited to handling civil cases and already existing criminal cases.  While working for DPSCS, Neverdon handled approximately sixteen to twenty cases per month in his law practice, the Law Office of Russell A. Neverdon, Sr., LLC. During that time, Neverdon maintained an office for his law practice and worked in the office approximately eight hours per week, usually outside of normal business hours during the week and on weekends.

Neverdon employed Mr. Scherron J. Lee as a paralegal in his law office.  Lee is not licensed to practice law in Maryland.  When Neverdon worked in the office during non-business hours, he would leave notes for Lee with tasks for Lee to perform and he would leave drafts of pleadings, letters, and other documents for Lee to finalize during the next business day.  During workdays, Neverdon and Lee communicated by e-mail and text

messages and occasionally by telephone.[7]

## Initiation of Representation

On January 8, 2017, Rodney C. Chase, who was working as a traffic flagger at a road construction site, was struck and killed by a vehicle driven by Jason Disney.  Disney had been travelling at a high rate of speed and there were at least three witnesses to the accident.  Chase had no immediate family and died intestate.  Prior to his death, Chase had received treatment for drug dependency that had been paid for by the Maryland Department of Health ("MDH").   Chase was survived by four cousins: Marjorie Purvey, Michael Willingham, Russell Willingham,[8] and Julia Chance (collectively, "the Clients").  Michael arranged for a funeral director to claim Chase's body and funeral expenses were paid for by Chesapeake Employers' Insurance Company ("CEICO"), Chase's employer's workers' compensation insurer.

On or about January 26, 2017, Neverdon met with Purvey, Michael, and Russell to discuss possibly representing them.  Chance, who lived in New York, participated in the meeting by telephone.  Prior to the meeting, Neverdon learned that Michael had retained, or at least spoken to, another attorney.  During the meeting, Neverdon told the Clients that they could hire separate attorneys, but Neverdon did not explain, either at that time or any other time, about the possibility of a conflict of interest between the Clients and he never

---

[7]Although the hearing judge found that the communication occurred, the hearing judge noted that, during discovery, Neverdon did not produce records of any text messages or telephone calls that he had with Lee.

[8]Because they have the same surname, we refer to Michael Willingham and Russell Willingham by their first names.

explained what he would need to do should such a conflict of interest arise.  During the meeting, Neverdon explained that, if retained, he would "handle the case," which, according to the hearing judge, included filing the necessary documents to open an estate for Chase ("the Estate").  Neverdon did not tell the Clients during the meeting, however, that he had a full-time job with DPSCS.  At the end of the meeting, the Clients agreed to retain Neverdon in connection with Chase's death.

After the meeting, Neverdon instructed Lee to prepare engagement agreements for the Clients.  The engagement agreements were identical, with the exception of the name of the Client to whom a particular agreement pertained.  The agreements described the scope of the representation as follows: "You have requested the Law Office of Russell A. Neverdon, Sr., LLC to represent you in connection with an Estate matter in conjunction with a wrongful death and survivorship cause of action regarding [] Chase."  The agreements provided that the Clients were responsible for reimbursing Neverdon for any out-of-pocket expenses and included a breakdown of the potential expenses.  The agreements did not require the Clients to provide a retainer or escrow payment to cover such possible expenses.  The agreements detailed that Neverdon's hourly fee was $400 but indicated that the Clients would be responsible for the fee only if the Clients terminated the representation and engaged other counsel or settled the matter on their own.[9]

---

[9]The engagement agreements, which were admitted into evidence at the disciplinary hearing, provided that they were "contingent fee" contracts, and that if the matter were resolved by way of settlement prior to the filing of a lawsuit, Neverdon's compensation would be $33 \frac{1}{3}\%$ of the settlement amount, and if resolved after the filing of a lawsuit, Neverdon's compensation would be 40% of any proceeds recovered or awarded.  The

Purvey and Michael were selected to serve as personal representatives of the Estate. Neverdon learned through discussions with Purvey that her relationship with Michael was contentious.[10]  Neverdon learned that Purvey disapproved of the manner in which Michael handled claiming Chase's body and the funeral and Purvey believed that Michael and Chase had used drugs together in the past.  Neverdon learned that Purvey's main goal for the representation was to ensure that Disney was held accountable for Chase's death. Despite what Neverdon had learned from Purvey, the engagement agreements failed to provide any information about the possibility of conflicts of interest between the Clients or what steps would need to be taken if a conflict arose.

On January 26, 2017, Michael and Russell signed the engagement agreements. Sometime after January 30, 2017, Purvey signed an engagement agreement.[11]

### The Survival Action

Early in the representation, Neverdon concluded that there could not be a wrongful death claim because Chase did not have any dependents.  Neverdon concluded that the only avenue for recovery would be a survival action brought on behalf of the Estate.  Early on,

---

agreements stated that it was understood that if no recovery were obtained, then no fee payment would be due to Neverdon.

[10]Purvey also made Lee aware of her feelings about Michael.  In a telephone call on May 29, 2017, Purvey expressed to Lee her dislike of Michael as well as her desire to not have to deal with Michael.

[11]The hearing judge noted that one of the exhibits consisted of an engagement agreement purportedly signed by Chance on January 30, 2017.  According to the hearing judge, this was "curious" as, on January 30, 2017, Lee sent an e-mail to Neverdon indicating that Chance's signature had not yet been obtained.

Neverdon met with Purvey at least two times at her home.[12]  During those meetings, Purvey indicated that she had heard Chase had been struck from behind by Disney and that Chase may have owned an automobile.  Following the initial January 26, 2017 meeting, Neverdon instructed Lee to prepare documents, including a letter to the Anne Arundel County Police Department requesting a copy of the accident report and a letter to Chase's employer seeking information.  On February 23, 2017, Lee wrote a letter to the Anne Arundel County Police Department's Accident Report Unit requesting the accident report.  At some point between February 23, 2017 and March 15, 2017, Neverdon received the accident report, which identified Disney as the driver of the vehicle that struck Chase and provided the name of the vehicle's insurer, Nationwide Insurance ("Nationwide"), and a policy number. The accident report did not identify who owned the vehicle that Disney had been driving and Neverdon did not investigate the matter.

On March 15, 2017, at Neverdon's instruction, Lee sent two letters to Nationwide— one requesting that Nationwide identify any personal injury protection or "Med-Pay" coverage that was available for Chase and one requesting that Nationwide put its position as to liability in writing.  Also on March 15, 2017, Lee sent two follow-up letters to the Anne Arundel County Police Department—one to Evidence Control requesting Chase's personal effects and one to the Traffic Safety Division requesting an accident reconstruction report.

Neverdon began an investigation with respect to Disney by conducting online

---

[12]Following the initial meeting, Neverdon did not meet with Michael and Russell again and Neverdon did not meet with Chance in person at all during the representation.

research.  Through a "people search," Neverdon determined that Disney was in his early thirties.  Using Maryland Judiciary Case Search, Neverdon discovered that Disney had prior convictions for traffic and criminal offenses.  Neverdon searched Maryland land records, which did not show any property registered in Disney's name.  Using the Maryland State Department of Assessments and Taxation's website, Neverdon determined that Disney was not identified as the owner of the residence displayed on his driver's license.  Based on his investigation, Neverdon concluded that there was a strong likelihood that Disney did not have any assets.

Neverdon spoke to the funeral director who told him that Chase's body had significant injuries to the back, but only superficial injuries on the front.  Neverdon also visited the accident scene.  From his investigation, as well as the information Purvey had provided, Neverdon concluded that Chase had been struck from the rear and did not see Disney coming before being hit.

On March 20, 2017, CEICO sent a letter to Nationwide, on which Neverdon was copied, notifying Nationwide that it had a statutory lien in the amount of $7,000 against the Estate for funeral expenses.  The following day, Nationwide sent a letter to Neverdon, stating that CEICO had paid $7,000 in funeral expenses and that Nationwide would reduce any payments made under the applicable policy by that amount if CEICO had not been reimbursed at the time of payment.  In addition, Nationwide advised Neverdon that its insured was named Daryl Disney, not Jason Disney.  Lee received Nationwide's letter on Neverdon's behalf.  Lee thought that the letter was a response to the letter he had sent demanding personal injury protection benefits on Chase's behalf.  Lee did not understand

the meaning of Nationwide's letter and spoke with Neverdon, who instructed Lee to call Nationwide to determine the meaning of the letter.   On March 23, 2017, Lee called Nationwide and spoke with Lisa Dugan, who informed him that Nationwide's insured was Daryl Disney, not Jason Disney (the driver of the vehicle that struck Chase).   Dugan also advised Lee that personal injury protection benefits were not available in the case.   Neither Neverdon nor Lee investigated who Daryl Disney was or what, if any, connection he had to Jason Disney or the vehicle Jason Disney had been driving, or the accident that killed Chase.

On April 6, 2017, Lee faxed a demand letter to Nationwide under his signature demanding a settlement in the amount of the policy limits.   Lee had e-mailed a draft of the demand letter to Neverdon before faxing it to Nationwide.   Neither Neverdon nor Lee knew what the policy limits were at the time that the demand letter was sent to Nationwide.   In the demand letter, Lee made several legal assertions.   Lee wrote that the "insured," Jason Disney, had failed to operate the vehicle in a "safe and prudent" manner by failing to keep a safe look-out while driving, failing to avoid an accident, failing to keep control of the vehicle, and failing to obey traffic devices.   Lee wrote that, due to Jason Disney's "negligence," Chase was fatally injured.   Lee made a demand for a settlement in the amount of the policy limits "to compensate for the loss of life of [] Chase, as well as the pain, suffering, inconvenience, and funeral costs incurred by his surviving family member."

On May 17, 2017, Lee sent a follow-up e-mail to Nationwide requesting a response to the demand letter.   Lee made a legal assertion in the e-mail by stating that Chase "was fatally injured as a direct and proximate result of your insured's negligence."   On May 22,

2017, Neverdon received a letter from Nationwide in which Nationwide confirmed receipt of the demand letter, but again identified Daryl Disney as the policy holder.  According to the hearing judge, on May 30, 2017, Lee spoke with Dugan, who advised Lee that Nationwide had made several attempts to speak with "Mr. Disney" but had been unable to reach him.[13]  On June 7, 2017, Lee again spoke with Dugan, who requested that he send her the Letters of Administration issued by the Orphans' Court so that Nationwide could extend a settlement offer.  The following day, Lee faxed the Letters of Administration to Dugan.

On June 22, 2017, Lee spoke with a representative of Chase's employer, PDI Sheetz Construction Company.  The representative advised that Chase did not have a pension, 401(k), or "retirement."  The representative did not know whether Chase owned a vehicle.[14] On the same day, Dugan sent Neverdon a letter enclosing a "Release of All Claims" and a "Medicare Addendum" form.  The release contained a settlement offer of $30,000 in exchange for the release of all claims against all possible tortfeasors.

On or about July 11, 2017, the Anne Arundel County Police Department's Traffic Safety Section released[15] a thirty-two-page Motor Vehicle Collision Reconstruction Report

---

[13]Respondent's Exhibit 45 contains handwritten notes by Lee.  A notation for May 30, 2017, indicates that Dugan attempted to speak with the "insured," who would be Daryl Disney.

[14]The hearing judge noted that Neverdon and Lee spent time trying to determine whether Chase owned a vehicle.  Neverdon indicated that the purpose of the search was to determine whether Chase had insurance on a vehicle which might enable the Estate to assert an underinsured motorist claim.  Neverdon ultimately discovered that Chase did not own a vehicle.

[15]The hearing Judge did not indicate to whom or how the Reconstruction Report had been released.

concerning the accident ("the Reconstruction Report").    The Reconstruction Report indicated the following.  There were at least three witnesses to the accident, each of whom had given a statement.  Jason Disney provided minimal information to law enforcement at the scene of the accident and invoked his right to counsel.    Disney saw Chase approximately 100 feet before impact and applied the brakes and began to skid approximately twenty-seven feet before impact.    The vehicle that Disney drove was equipped with an Ignition Interlock system because Disney's driver's license was "alcohol restricted."  Disney may have been distracted by the Ignition Interlock system requesting a "rolling retest" just prior to the accident.[16]  Neverdon never obtained a copy of the Reconstruction Report and never attempted to speak with the witnesses or Disney.

### Opening the Estate

At the meeting of January 26, 2017 described above, the Clients agreed that Purvey and Michael would serve as personal representatives of the Estate.    After the meeting, Neverdon instructed Lee to search online for the forms needed to open an estate and to "populate" the forms with the required information.  Lee had never previously worked on opening an estate.  Lee prepared a Petition for Administration of a Small Estate to request the appointment of Purvey and Michael as personal representatives and a Schedule B to identify the assets and debts of the decedent.  Lee also prepared a "Consent to Appointment

---

[16]The Reconstruction Report explains that, during a rolling retest, the Ignition Interlock device would have given an audible command for the operator to provide a breath sample.  The Reconstruction Report indicates that the Ignition Interlock device asked Disney to perform a rolling retest at 12:46:33 p.m. on the day of the accident and that the first call reporting the collision to the police department's 911 service occurred at 12:47:28 p.m., approximately a minute later.

of Personal Representative" identifying Purvey and Michael as personal representatives for both Russell and Chance as interested parties. At some point, Michael and Russell signed estate-related documents at a meeting with Lee; and, Purvey separately signed similar documents at a meeting with Lee.

On February 14, 2017, six documents were filed in the Orphans' Court. First, the Small Estate Petition for Administration signed by Purvey and Michael was filed. The petition included a line for counsel to sign under oath. Lee signed the petition to look like Neverdon's signature and did so with Neverdon's knowledge and consent. Second, Schedule B, which was signed by Purvey and Michael, was filed. Like the petition, Schedule B included a line for counsel to sign under oath and Lee signed Neverdon's signature with Neverdon's consent. Third, a Consent to Appointment signed by Russell was filed. Again, Lee signed the document with Neverdon's signature with Neverdon's consent. Fourth, a Consent to Appointment "purportedly signed by" Chance was filed. Yet again, Lee signed the document for Neverdon with consent. Fifth, a second Consent to Appointment "purportedly signed by" Chance[17] was filed, with Lee having signed for Neverdon, again with Neverdon's consent. Sixth, a "List of Interested Persons," containing the names of the four beneficiaries (the Clients), their relationship to Chase, and their last known addresses was filed. The list contained the purported signatures of each of the

---

[17]The hearing judge observed that "Chance's signature and handwritten name on the second Consent to Appointment [are] visibly different than her signature and handwritten name on the first Consent to Appointment."

Clients.[18]  Although there was a place for counsel to sign under oath, Neverdon did not sign the list prior to its filing.

On May 15, 2017, the Register of Wills for Baltimore City sent Neverdon a "Delinquent Notice" concerning the failure to timely file a required "Information Report."[19]  The personal representatives were copied.  On June 6, 2017, the Orphans' Court issued a show cause order to the personal representatives for the failure to file the Information Report.  On June 7, 2017, the show cause order was mailed to Neverdon, Purvey, and Michael.  After Purvey received the show cause order, she called Neverdon's office and spoke with Lee.  Purvey eventually spoke with Neverdon, too, about the show cause order.  On June 14, 2017, Lee spoke with Michael.  After the conversation, Lee sent Michael a draft Information Report for his signature.  Lee did not send Purvey a draft Information Report for her signature.

On June 22, 2017, Lee received the signed Information Report from Michael.  At 1:38 p.m. that day, Lee sent an e-mail to Neverdon with the subject line "Chase (Response to Show Cause Order) URGENT URGENT URGENT" and the e-mail contained a draft of the response to the show cause order for Neverdon's review.   (Capitalization in original).  The following day, the response was filed in the Orphans' Court.  The response that was filed was identical to the draft that Lee sent to Neverdon, including typographical errors,

---

[18]The hearing judge noted that "each signature on the List appears to be different than the signatures contained in the other five documents filed in the Orphans' Court."

[19]According to Petitioner's Exhibits 34 and 42, the Information Report was due on May 14, 2017.  The Information Report is a document that would contain information about the decedent's ownership, transfer, or interest in real or leasehold property in or outside of Maryland.

such as Chase's middle name being misspelled and the word "response" in the title of the document being misspelled as "Respone." The response included the following statement:

> The address given to this office for Mr. Willingham was his brother's address. Unbeknownst to us, he no longer resides there. Also, the only phone number we had for him had changed. Therefore, we had to wait for him to contact this office to update our records and make arrangements to get his signature on the Information Report.

Lee signed the response to look like Neverdon's signature and did so with Neverdon's consent.

On the same day, Lee filed the Information Report with the Register of Wills. The Information Report contained the purported signatures of the personal representatives, Purvey and Michael. Michael's signature was valid. Lee, however, falsified Purvey's signature without her consent. With Neverdon's consent, Lee signed the Information Report to look like Neverdon's signature. Lee did not send copies of the Information Report to Purvey or Michael.

### Settlement Dispute and Emergency Petition

On July 11, 2017, Lee sent letters that he had originally drafted on June 22, 2017, to each of the Clients advising them of the $30,000 settlement offer. As to the settlement offer, Lee stated in the letters that "it is the maximum payout given the circumstances." Lee also stated that the "office's fees and expenses" and the funeral expenses would need to be reimbursed from the settlement proceeds and that the remainder would go into the Estate. Lee suggested that the Clients discuss the settlement offer.

On July 14, 2017, MDH filed a claim against the Estate for $19,124.78 for medical expenses incurred by Chase from September 1, 2013 to January 31, 2017.

On July 19, 2017, Lee spoke with Michael and Chance about the settlement offer. During the conversation, Lee indicated that he was attempting to arrange a meeting so that the personal representatives could sign the release. Lee had a similar telephone conversation with Purvey a couple of days later. During that conversation, Purvey indicated to Lee that she was not concerned with the money, but rather wanted to make sure that Disney was held accountable for Chase's death.

On July 26, 2017, Lee sent nearly identical letters to the Clients. In the letters, Lee reiterated that Nationwide had made a $30,000 settlement offer. Lee stated that the amount was not much "consolation for the loss of your cousin's life; however, it is all that is available at this time." Lee incorrectly stated that, to the extent that a judgment was obtained against Disney and he had assets, "a lien can be placed against his property; however, the lien can only be enforced when and if [] Disney decides to sell the property. The court cannot force the sale of his personal or real property." Lee informed the Clients of the $19,123.78 MDH lien. Lee asserted that Neverdon would "negotiate a pay-off so that you and all the remaining persons of interest will be able to walk away with some semblance of settlement for your loss." Lee concluded the letters by stating that Neverdon had a greater chance of successfully negotiating the MDH lien if the Clients acted promptly to resolve the survival action.

On August 4, 2017, Lee sent a letter to the Anne Arundel County Police Department inquiring about the investigation into Chase's death. On August 8, 2017, Lee sent a letter to the Anne Arundel County State's Attorney's Office requesting an update on the possibility of criminal charges against Disney. On September 1, 2017, Lee met with the

Clients to obtain signatures on the release.[20]  During the meeting, Lee provided the release to Michael and Purvey and instructed them to read it and ask questions.  Lee did not explain the content of the release.  Purvey again stated that she wanted Disney to be held responsible for Chase's death.  Lee tried to explain that Neverdon did not have control over whether the State brought charges against Disney.  The meeting became contentious and Michael and Purvey refused to sign the release.  Purvey pointed her finger at Lee and stated that "something just isn't right."  Lee stepped out of the meeting to call Neverdon. Neverdon instructed that Lee should end the meeting and return to the office[21] and that all further communications with the Clients should be in writing.

A few days later, on September 6, 2017, Lee sent nearly identical letters to each of the Clients.  The letters contained much of the same information that had been included in the July 26, 2017 letters.  In the letters, Lee stated that there appeared to be confusion about the scope of the representation.  Lee indicated that, per the retainer agreement, the law "office was retained to represent your family's interest in two (2) matters and two (2) matters only, personal injury and Wills/Estate/& Trusts."  Lee also advised that Neverdon had obtained two outstanding payroll checks owed to Chase totaling $417.38.

Lee discussed the possibility of filing suit against Disney personally and incorrectly stated that "a civil suit is very different than the personal injury matter we were retained to represent your family in."  Lee asserted that a contingency fee arrangement had been agreed on "because liability is clear and payment is, for the most part, assured."  Lee explained

---

[20]Chance attended the meeting by telephone.
[21]The meeting had occurred at Purvey's home.

that attempting to secure payment of a judgment against a person "is not as simple and requires more time, up-front payment and potentially more expenses, including, but not limited to, private investigators." Lee claimed that this was why a retainer payment would be required, explaining that a retainer payment could be between $2,500 and $10,000 depending on the circumstances. Lee explained that the office would deduct the hourly fee from the retainer payment until it was exhausted and that, once exhausted, "it is possible additional payment may be required. This office bills at $400 per hour." Lee again asserted that it was difficult to collect a judgment against a person's assets and incorrectly stated that a court could not "force him to sell any of it."

In the letters, Lee again discussed the liens against the Estate and that Neverdon could attempt to negotiate a reduction in the amount of the MDH lien. Lee claimed, though, that it did "not make sense for us to begin negotiating a pay-off especially when we are unable to give them a time frame when they can expect payment for whatever the negotiated amount will be. After all, it appears that we are not getting cooperation from the Co-Personal Representatives."

Lee also discussed the concern that Disney had not been criminally charged. Lee explained that only the State's Attorney's Office, not Neverdon, had the ability to bring charges against Disney. Lee concluded the letters by stating that the law office had "done what it was retained to do" and stating that there was "nothing more for this office to do until we acquire the mandatory required signatures."

After receiving the letter, Michael felt pressure to settle the case, so on September 19, 2017, he went into Neverdon's office and signed the release. Lee was present at that

time; Neverdon was not.  Around the same time, Lee told Michael that Neverdon intended to file a petition to remove Purvey as a personal representative due to her refusal to sign the release.  On September 19, 2017, Lee drafted a letter to the Clients expressing frustration about Purvey's refusal to sign the release and stating that Neverdon intended to file a petition to remove Purvey as a personal representative if she continued to refuse to sign the release.  Although Lee e-mailed the draft letter to Neverdon for his review, the draft letter was never sent to the Clients.

On November 3, 2017, Neverdon filed in the Orphans' Court an "Emergency Petition to Remove Marjorie Purvey as a Personal Representative."  In the emergency petition, Neverdon asserted that all other persons of interest agreed to remove Purvey as a personal representative "to proceed with resolving the outstanding asset."  Neverdon asserted that Purvey suffered from serious health conditions and had contacted his office more than once indicating that the stress related to the matter and the responsibilities of being a personal representative were not good for her health.  Neverdon asserted that Purvey had stated that her physician recommended that she remove herself from serving as a personal representative.  With Neverdon's knowledge and consent, Lee signed the emergency petition and accompanying certificate of service to look like Neverdon's signature.

On November 15, 2017, the Orphans' Court issued a show cause order requiring Purvey to respond in writing before December 15, 2017 as to why she should not be removed as a personal representative.  The Orphans' Court instructed Neverdon to serve copies of the emergency petition on Purvey, or her attorney, by November 30, 2017.  The

show cause order reduced Purvey's role "to that of a special administrator," which limited what she was able to do on behalf of the Estate.  Neverdon did not serve the emergency petition and show cause order on Purvey until December 7, 2017 and did so by regular mail.  On December 15, 2017, Purvey filed a response to the show cause order, requesting that the emergency petition be denied and that she remain a personal representative of the Estate.  The response was not sent to Neverdon.

At some time between December 15, 2017 and January 10, 2018, Neverdon contacted the Orphans' Court to request an update and learned that Purvey had filed a response to the show cause order.  On January 10, 2018, Neverdon sent a letter to Purvey asserting that, during their last conversation, Purvey had clearly indicated that she was not happy with the co-personal representative relationship with Michael and that her family was not on the same page as she was, as they were concerned about money whereas she was seeking justice for Chase.  Neverdon noted that the consent of all other interested persons, including Russell, Michael, and Chance, had been obtained[22] and that Michael had signed the release.  Neverdon stated that, despite those circumstances, Purvey had remained "adamant" that she would not sign the release.  Neverdon indicated that he had told Purvey that he would have no choice but to involve the Orphans' Court because he "could not allow there to be competing positions to jeopardize the surviving heirs' interests."  Neverdon imposed a deadline for Purvey to respond as to whether she would "cooperate" or whether he would "have no choice but to continue proceeding with trying to have [her]

---

[22]Neverdon appeared to be indicating in his letter to Purvey that the consent to settle had been obtained from all interested persons.

removed as Personal Representative."

A few days later, on January 16, 2018, Lee had a telephone conference with Purvey and Clarice Brown, a person who had been assisting Purvey.  Lee, Purvey, and Brown discussed Neverdon's January 10, 2018 letter and Brown indicated that she would discuss the matter with Purvey and get back to Lee and Neverdon.  Soon thereafter, Lee discovered that a grand jury in Anne Arundel County had approved charges against Disney.  Lee called Purvey to give her an update.  On January 25, 2018, Lee sent a letter to Purvey advising that the State's Attorney's Office was bringing charges against Disney in connection with Chase's death.  Lee advised that, because Neverdon had not heard from Purvey about his earlier letter, Neverdon took the lack of response as an indication that Purvey would not sign the release and that he would "renew" the emergency petition to remove her as a personal representative.  Lee sent similar letters to Michael, Russell, and Chance, stating that Neverdon intended to renew the emergency petition to remove Purvey as a personal representative.  Lee advised Michael, Russell, and Chance that if they did not contact Neverdon, their silence would be understood to mean that they agreed with seeking to remove Purvey.

Sometime during the following week, Lee spoke with Brown by telephone and the two discussed making arrangements for Purvey to come to the office and sign the release. On February 5, 2018, Lee sent an e-mail to Brown confirming the details of the telephone call.  The following day, accompanied by Brown and Brown's husband, Purvey went into Neverdon's office to sign the release.  Neverdon was not present.  Lee did not explain the release and instead instructed Purvey to read it and ask any questions she might have.

Purvey signed the release.  During the meeting, Lee told Purvey and Brown that a letter would be sent to MDH concerning its lien.[23]

On February 8, 2018, Nationwide sent a check in the amount of $30,000 to Neverdon's office.  On or before February 13, 2018, Lee received the check on Neverdon's behalf.  On February 14, 2018, Lee sent letters to the Clients advising them that the settlement check had been received and that efforts were being made to have Purvey and Michael sign the check so that it could be deposited into escrow.  In the letters, Lee advised the Clients that $7,000 of the settlement proceeds would be used to reimburse CEICO for funeral expenses and that $19,124.78 would be used to reimburse MDH.  Lee also enclosed a copy of a document entitled "Claim Against the Estate" that Neverdon would be filing in the Orphans' Court seeking $10,000 in attorney's fees.  Two days later, Michael went to the office and signed the settlement check.  Purvey was scheduled to go into the office the following day, but Brown called and told Lee that Purvey would not be able to make the appointment.

On February 22, 2018, the Orphans' Court sent a notice advising that a hearing on the emergency petition was scheduled for March 19, 2018.  On or around March 18, 2018, Neverdon contacted the Orphans' Court and asked the Court Administrator if it would be necessary for him to appear at the hearing on the emergency petition.  Neverdon was advised that he did not need to appear.  On March 19, 2018, the Orphans' Court held the scheduled hearing.  Michael, Russell, and Purvey, who was accompanied by Brown,

---

[23]On January 12, 2018, Lee sent a letter to MDH requesting that it waive or reduce its lien.

attended.  Neverdon did not appear.  During the hearing, the Orphans' Court was advised that the release had been signed by Michael and Purvey, but that the recently received settlement check had not yet been signed by Purvey.  After the hearing, the Orphans' Court issued an order in which it indicated that consideration of the emergency petition would be continued pending the filing of the signed release and settlement check by March 26, 2018.  Between March 6 and 25, 2018, Neverdon, Lee, and Brown exchanged e-mails about rescheduling a time for Purvey to sign the settlement check.  On March 26, 2018, Lee went to Purvey's house and Purvey signed the settlement check.  Sometime thereafter, the settlement check was deposited into Neverdon's escrow account and Neverdon withdrew $10,000 from the escrow account as payment of his attorney's fee.

On May 30, 2018, the Orphans' Court issued a notice initially scheduling a hearing on the emergency petition for July 2, 2018; the court subsequently sent a notice rescheduling the hearing to July 30, 2018.  Copies of the notices were sent to Neverdon, the Clients, and MDH.  Sometime before July 30, 2018, the Orphans' Court contacted Neverdon's office inquiring as to whether Neverdon wanted to proceed with the hearing.  Neverdon stated that he did not want to go forward, as Purvey had signed the release and settlement check.  As a result, the Orphans' Court dismissed the emergency petition.  Neither Neverdon nor Lee informed Purvey of the conversation with the Orphans' Court or that the emergency petition had been dismissed.

On July 30, 2018, Purvey and Brown appeared at the Orphans' Court for the hearing and discovered that the emergency petition had been dismissed.  Neverdon did not appear.  The following day, Brown e-mailed Neverdon and stated that Purvey had not heard from

him or Lee since March.  Brown requested information about the purpose of the July 30, 2018 hearing and the status of MDH's lien.  Brown indicated that Purvey was "very fearful of contacting your office since her last phone call with [] Lee in which he released a tirade of yelling and screaming demeaning remarks."  Neverdon responded by e-mail the same day, informing Brown that he could not communicate with her and reminding her that if Purvey was not capable of performing the duties of personal representative, including communicating with counsel, then Purvey could file a motion to relieve herself of those duties.  Neverdon did not discuss Lee's behavior that Brown had mentioned.  On August 6, 2018, in another e-mail to Neverdon, Brown stated that Purvey believed herself capable of performing the duties of personal representative, including communicating with Neverdon.  Neverdon responded by e-mail that day stating that all communications between him and Purvey should be in writing moving forward.

### Administration of the Estate

As explained above, on March 20, 2017, CEICO provided notice of a lien against the Estate in the amount of $7,000 for funeral expenses for Chase.  Lee was unaware that waiver or reduction of the lien was possible and Neverdon and Lee did not discuss the matter.  As such, no attempt was made to negotiate with CEICO about its lien.

On July 14, 2017, MDH filed in the Orphans' Court a notice of claim in the amount of $19,124.78 for medical expenses for Chase.  During his representation of the Clients, Neverdon advised them several times that he would attempt to negotiate a waiver or reduction of MDH's lien.  To that end, on January 10, 2018, Lee sent a letter to MDH asking that it waive or reduce the lien.  On April 2, 2018, a representative from MDH e-

mailed Lee, advising that MDH was not able to waive or reduce the lien. The representative advised, though, that money spent on a headstone would qualify as an allowable deduction if the funeral expenses did not exceed $15,000.

Sometime before June 20, 2018, Lee had telephone conversations with Michael, advising Michael of duties that he and Purvey were required to perform as personal representatives. The duties included opening a bank account for the Estate and depositing the settlement proceeds and two payroll checks into the account. Sometime before September 1, 2018, Purvey and Michael picked up the paychecks from Lee, with the intent to open a bank account for the Estate and deposit the checks. At Purvey's suggestion, she and Michael tried to open a bank account at a MECU Credit Union branch but were advised that the bank did not handle estate accounts. Purvey and Michael were not able to agree on a different bank for the Estate's account.

On October 5, 2018, Lee sent letters to Purvey and Michael concerning the administration of the Estate, reiterating information that he had previously given Michael concerning the responsibilities of the personal representatives, including the need to open a bank account for the Estate, deposit Chase's payroll checks into the bank account, and disburse payments to lienholders. Lee requested an update on the opening of a bank account and stated that Neverdon would not issue a check for the settlement proceeds until a bank account was opened. Lee indicated that, after the settlement proceeds were deposited, Purvey and Michael would be responsible for satisfying liens owed to CEICO and MDH. On December 28, 2018, Michael sent an affidavit to Neverdon advising that he no longer wanted to serve as a personal representative due to stress.

On December 31, 2018, Neverdon wrote a check for $20,000 payable to the Estate from his attorney trust account.  Neverdon wrote "Settlement Proceeds minus atty fees" on the memo line of the check.  On January 3, 2019, Lee sent the check and a letter to Purvey. Lee requested an update on whether a bank account for the Estate had been opened and whether the personal representatives had deposited the paychecks into the account and contacted lienholders.  Lee stated that MDH had rendered "free or reduced healthcare service to" Chase and that CEICO had paid Chase's funeral expenses and, as such, both were "entitled to be reimbursed."  Lee also told Purvey of Michael's desire to be removed as personal representative.  At the conclusion of the letter, Lee stated: "As such, this will conclude the office's services in this matter."  On the same day, Lee sent Michael a similar letter.  Lee acknowledged that Michael no longer wanted to serve as a personal representative but told Michael that he would remain a personal representative until the Orphans' Court granted a motion.[24]  At the end of the letter, Lee wrote: "At this juncture, the office considers this matter now closed."  A few days later, on January 7, 2019, Lee sent letters to Russell and Chance advising of Michael's request to be removed as a personal representative.

On April 12, 2019, the Orphans' Court sent notices to Neverdon, Purvey, and Michael advising them that they were required to file within thirty days a supplemental Schedule B identifying any additional assets obtained for the Estate, including automobile

---

[24]According to Lee's letter to Michael, Neverdon had agreed to assist Michael "gratis, as a friend of the court" in filing a petition requesting his removal as co-personal representative.

settlement proceeds.

Over a year later, on September 17, 2020, Neverdon sent a letter to MDH requesting that MDH reduce its lien to $5,000 in light of a particular Maryland regulation.[25]  Neverdon learned of the regulation during the deposition of Bar Counsel's expert in the disciplinary proceeding.  On September 24, 2020, a representative from MDH e-mailed Neverdon advising that MDH would consider the regulation and the request to reduce its lien.  The hearing judge noted that, as of the conclusion of the disciplinary hearing, MDH had not responded to Neverdon's request for a reduction of the lien.

Additionally, the hearing judge found that the personal representatives had not opened a bank account for the Estate and that the $20,000 check that Lee sent to Purvey had not been cashed and that the funds remain in Neverdon's escrow account.

### Bar Counsel's Investigation

On September 10, 2018, Purvey, with Brown's assistance, filed a complaint against Neverdon with Bar Counsel.  On September 19, 2018, Bar Counsel requested that Neverdon respond to the complaint by October 10, 2018.

In a letter dated October 10, 2018, Neverdon responded.  In the response, among other things, Neverdon stated: "I was not formally retained to handle the Estate matter and

---

[25]The regulation Neverdon referred to is Code of Maryland Regulations (COMAR) 10.09.83.02F(1)(b), which concerns MDH's recovery in subrogation claims and provides:

(1) Except as provided in §§F(2)-(4) of this regulation, in satisfaction of the Department's subrogation claim, the Department shall recover the lesser of:
   (a) The full amount of past medical costs paid by the Program; or
   (b) 50 percent of the judgment, award or settlement less attorney fees, litigation costs, and other deductions required by law.

act in the capacity of Personal Representative (PR), but rather, to help establish and open the estate." Neverdon advised that he opened the Estate "as a courtesy" for the Clients. Neverdon also advised that, after being notified of the show cause order for failure to file an Information Report, his office prepared and submitted the report on behalf of the Clients "as a courtesy." Additionally, in the response, Neverdon detailed telephone calls and a meeting he had with Purvey after the September 1, 2017 meeting (the meeting at which Michael and Purvey refused to sign the release). Neverdon asserted that, during those conversations, he informed Purvey that he would have "to seek the court's guidance" after she refused to sign the release.

On March 29, 2019, Bar Counsel sent a letter to Neverdon requesting more information. Among other things, Bar Counsel requested documents concerning the receipt, maintenance, and disbursement of funds for the case. Bar Counsel requested information concerning whether Neverdon had advised Purvey to seek counsel when he determined he needed to file the emergency petition. In addition, Bar Counsel requested that Neverdon respond to the allegation that Purvey's signature on the Information Report had been forged.

On April 11, 2019, Neverdon responded. As to the requested documentation, Neverdon provided Bar Counsel with copies of the $30,000 check received from Nationwide and the $20,000 check sent to Purvey. Neverdon did not provide, and has never provided, a copy of the check used to withdraw his attorney's fee from his escrow account or a ledger for the case or his escrow account. As to whether Neverdon had advised Purvey to seek counsel, in the response, Neverdon mentioned conversations he supposedly

had with Purvey after the September 1, 2017 meeting.  Neverdon stated that he specifically informed Purvey that he was going to "seek removal o[f] your position as [personal representative] and if you believe that you don't have an obligation to all of the other interested persons, you should seek the advice of counsel."  As to whether Purvey's signature had been forged on the Information Report, Neverdon responded that Lee had obtained Purvey's consent to sign her name.  Neverdon attached to the response an affidavit from Lee to that effect.

## STANDARD OF REVIEW

In an attorney discipline proceeding, this Court reviews for clear error a hearing judge's findings of fact, and reviews without deference a hearing judge's conclusions of law.  See Md. R. 19-741(b)(2)(B); Attorney Grievance Comm'n v. Slate, 457 Md. 610, 626, 180 A.3d 134, 144 (2018); Md. R. 19-741(b)(1).  This Court determines whether clear and convincing evidence establishes that a lawyer violated an MARPC.  See Md. R. 19-727(c).

## DISCUSSION

### (A) Findings of Fact

Bar Counsel does not except to any of the hearing judge's findings of fact.

Neverdon excepts to five of the hearing judge's findings of fact.  For the following reasons, we overrule all of Neverdon's exceptions.  First, Neverdon excepts to the hearing judge's finding that, while working at DPSCS, he worked in his law office approximately eight hours per week, "almost exclusively during the weekend and outside of normal business hours during the workweek."  Neverdon contends that his undisputed testimony

at the hearing was that he worked eight hours per week in his law office from Monday through Friday and that he worked additional hours in the law office on the weekends. In other words, it appears that Neverdon argues that the hearing judge erred in finding that he worked in his law office a total of approximately eight hours per week both outside of normal business hours during the week and on the weekend, *i.e*., Neverdon would like to be credited with having worked more hours in his law office.

The hearing judge did not clearly err in finding that Neverdon worked approximately eight hours in his law office during the weekend and outside of normal business hours during the week. At the hearing, Neverdon testified extensively about his work hours at DPSCS and his law office. Neverdon repeatedly testified that he worked anywhere from five to eight hours per week, Monday through Friday, at his law office, and that he also worked in his law office additional hours on the weekend. Neverdon, however, never specified a number or an amount of hours that he worked in the law office on the weekend. For example, Neverdon testified: "And then over weekend when I could come in and put a few hours in on a Saturday or Sunday. . . ." Given that Neverdon testified that he worked five to eight hours in the office during the week and never indicated a total number of hours that he worked in the law office on weekends, it was not clearly erroneous for the hearing judge to find that Neverdon worked in the office for "approximately" 8 hours per week outside of normal business hours during the workweek and during the weekend.

Second, Neverdon excepts to the hearing judge's finding that, in the demand letter to Nationwide, Lee made legal assertions and a policy limits demand. Neverdon contends

- 29 -

that his and Lee's undisputed testimony at the hearing demonstrates that the demand letter—and all other letters—were narrated or dictated by Neverdon.  Neverdon argues that the evidence shows that the recipients of letters knew that the correspondence was from him as the attorney and that the recipients were not confused as to who they were interacting with.  Neverdon asserts that, in response to the demand letter, Nationwide acknowledged receiving his demand letter and Nationwide did not mention Lee at all.

We overrule Neverdon's exception to the hearing judge's finding that Lee made legal assertions to Nationwide in a demand letter.  It does not appear that Neverdon challenges that information in the demand letter constituted "legal assertions."  Rather, Neverdon's complaint seems to be that he was responsible for drafting the letter, not Lee, and that the hearing judge erroneously attributed the content of the letter to Lee.  Although the demand letter was written on the letterhead of "Law Office of Russell A. Neverdon, Sr., LLC," the demand letter was signed only by Lee and the content of the letter in no way indicated that Lee was relaying information composed by Neverdon.  Indeed, the hearing judge specifically found that Lee e-mailed Neverdon a draft of the demand letter before mailing it.  The hearing judge was not required to find based on Lee's and Neverdon's testimony that the demand letter was drafted by Neverdon.  Nor does the circumstance that Nationwide responded in a form letter addressed to Neverdon indicate that Lee was not responsible for drafting the demand letter.  The record demonstrates that Lee sent the demand letter under his signature and e-mailed Neverdon a draft of the demand letter before mailing it.  As such, the hearing judge did not clearly err in finding that Lee drafted the letter and made the legal assertions contained therein.

Third, Neverdon excepts to the hearing judge's finding that the Information Report admitted into evidence as Petitioner's Exhibit 42 was the Information Report that was filed with the Register of Wills.  Rather, Neverdon contends that Respondent's Exhibit 12A, which according to Neverdon is a "file-stamped copy of the same Information Report," is the Information Report that was actually filed with the Register of Wills.

We overrule Neverdon's exception to the hearing judge's finding that the Information Report admitted into evidence as Petitioner's Exhibit 42 was the Information Report filed with the Register of Wills.  The record reflects that, in various instances at the disciplinary hearing, both Bar Counsel and Neverdon's counsel referred to Petitioner's Exhibit 42 as the Information Report that was filed with the Register of Wills.  During Bar Counsel's direct examination of Purvey, the following exchange occurred:

> [BAR COUNSEL:] Okay, so let me show you Exhibit 42.  Now this is the Information Report that was ultimately filed.  Did you meet with [] Neverdon in June of 2017?
>
> [PURVEY:] See it's been quite a while, but I only met with [] Neverdon the first time and the second with the brothers, and then when he asked me the third time, did Michael give me $500.  That's coming to me too.  He also asked me who did I think had the car or the truck, and I hesitated and I said I feel it could be Michael.
>
> [BAR COUNSEL:] Ma'am, did you ever authorize [] Neverdon or [] Lee to sign your name to a report to be filed with the Orphan[s'] Court?
>
> [PURVEY:] No, I would never do that.

This exchange reflects that Bar Counsel identified Petitioner's Exhibit 42 as the document that was ultimately filed.  There was no objection from Neverdon's counsel.  More importantly, in closing argument, Neverdon's counsel specifically referenced Petitioner's

Exhibit 42 as the document that was filed, stating: "And the document that he actually filed was the document that was signed in the beginning.  That was the actual Information Report which is Exhibit No. 42.  That was the one that was signed by [] Purvey in the beginning." At the disciplinary hearing, Neverdon's counsel appeared to argue that Purvey's signature was not forged on either Petitioner's Exhibit 42, which had been filed with the Register of Wills, or Respondent's Exhibit 12A.  In the exceptions, though, Neverdon appears to argue that the hearing judge was clearly erroneous in finding that Petitioner's Exhibit 42 was the document filed with the Register of Wills and that the document contains stray marks (which Respondent's Exhibit 12A does not) that, according to Neverdon, led to the hearing judge erroneously determining that Purvey's signature had been forged.  Regardless of this contention, the record reflects that, at the hearing, Neverdon's counsel did not object to Bar Counsel's question to Purvey which included the assertion that Petitioner's Exhibit 42 was the document that was filed with the Register of Wills and, in closing argument, Neverdon's counsel stated that Petitioner's Exhibit 42 had been filed with the Register of Wills.  Under these circumstances, the hearing judge's finding of fact was not clearly erroneous.

Fourth, Neverdon excepts to the hearing judge's finding that, after receiving the September 6, 2017 letter, Michael felt pressured to settle the case.  Neverdon contends that, at the hearing, Michael actually testified that he felt pressure to settle the case due to stress caused by Purvey and disparaging statements made by Purvey, not because Neverdon or the law office pressured him.

We overrule Neverdon's exception to the hearing judge's finding, as the hearing

judge did not clearly err in finding that, after receiving the September 6, 2017 letter, Michael felt pressured to settle the case. A review of the record indicates that the September 6, 2017 letter sent to Michael was admitted as Petitioner's Exhibit 57C during the disciplinary hearing. On direct examination, Michael was shown Petitioner's Exhibit 57C and responded that he recognized the letter. Immediately thereafter, Bar Counsel asked whether Michael felt "any pressure from [] Lee or [] Neverdon to settle the case[.]" Michael responded: "Yes, because they couldn't get anywhere with [] Purvey." Michael went on to describe the problems that he felt existed between Purvey and Lee and Neverdon. Later, during cross-examination, although Michael had previously indicated that he recognized Petitioner's Exhibit 57C, he responded to a question from Neverdon's counsel, who asked whether he recalled seeing the letter, that he did not remember seeing the letter. In response to an additional question from Neverdon's counsel, however, Michael stated that he felt pressure from both Lee and Purvey to settle the matter. Lee, of course, signed the September 6, 2017 letter. Given this testimony, it was not clearly erroneous for the hearing judge to find that Michael felt pressure to settle the case following receipt of the September 6, 2017 letter. In light of Michael's testimony on direct examination that he recognized the letter and that he felt pressure from both Neverdon and Lee to settle the matter and his confirmation on cross-examination that he felt pressure from Lee to settle, the hearing judge's finding is not clearly erroneous.

Fifth, Neverdon excepts to the hearing judge's finding that "no attempts were ever made to negotiate with CEICO on its lien." Neverdon contends that, at the hearing, he "advised" the hearing judge that he had informed the Clients that he would negotiate a

reduction of the liens.  Neverdon points out that, after the hearing, CEICO agreed to reduce its lien from $7,000 to $2,500.

At bottom, Neverdon does not claim that there is evidence supporting a finding that he attempted to negotiate with CEICO to reduce its lien.  Neverdon simply states that he advised the hearing judge that he told the Clients that he would negotiate and that, after the disciplinary hearing, CEICO indeed reduced its lien.  Nothing in Neverdon's assertion conflicts with the hearing judge's factual finding.

### (B) Conclusions of Law

Bar Counsel and Neverdon both have exceptions to the hearing judge's conclusions of law that we address below.

### MARPC 1.1 (Competence) and MARPC 1.3 (Diligence)

#### *The Hearing Judge's Conclusions*

The hearing judge concluded that Neverdon's conduct violated MARPC 1.1 and 1.3 in several ways but concluded as well that some of his conduct did not violate MARPC 1.1 or 1.3.  The hearing judge concluded that Neverdon violated MARPC 1.1 and 1.3 in the manner in which he investigated and prosecuted the survival action.  The hearing judge concluded that Neverdon failed to provide competent representation and to act with adequate diligence in investigating matters related to the survival action before recommending the settlement offer to the Clients.  Specifically, the hearing judge concluded that Neverdon failed to: (1) interview the witnesses to the accident; (2) investigate the viability of a claim for pre-impact fright; (3) conduct an adequate investigation into whether Jason Disney had assets or other means to pay a judgment; (4)

investigate the identity of Daryl Disney, the insured, to determine if there was a potential claim to be made against him; and (5) obtain and analyze the Reconstruction Report. The hearing judge noted that, although he accepted Neverdon's testimony that he (Neverdon) conducted online research into whether Jason Disney owned real property, Neverdon's "actions were simply insufficient for a case of this type and magnitude."

The hearing judge also concluded that Neverdon violated MARPC 1.1 by sending the letters of July 26, 2017 and September 6, 2017 to the Clients that contained incorrect statements of law. Among other things, in the September 6, 2017 letter, Neverdon incorrectly stated that a civil lawsuit would be very different than the personal injury matter that he had already been retained to represent the Clients in and that a retainer fee would be required, despite the circumstance that the engagement agreements did not require such a fee. The hearing judge noted that, in both letters, Neverdon incorrectly stated that a court could not force Disney to sell any of his assets if a judgment were obtained against him. The hearing judge determined that these incorrect statements were made "during a critical period" when the Clients were seeking Neverdon's advice as to whether or not to execute the release provided by Nationwide.

In addition, the hearing judge concluded that Neverdon violated MARPC 1.1 by failing to recognize or inform the Clients of a conflict of interest with respect to their signing of the release and the filing of the emergency petition (to remove Purvey as a co-personal representative). The hearing judge concluded that, after Michael signed the release and Purvey refused to sign the release, Neverdon should have recognized that a conflict of interest existed and that he needed to advise the Clients of as much. The hearing

judge concluded that Neverdon failed to advise at least three of the Clients of their right to seek outside counsel, he failed to advise the Clients of his potential obligation to withdraw from the representation due to the conflict, and he failed to obtain the informed, written consent of the Clients to his continued representation. The hearing judge concluded that Neverdon violated MARPC 1.1 and 1.3 by failing to make any effort to negotiate a waiver or reduction of the CEICO lien, even though the lien was directly related to the survival action and fell within the scope of the representation.

The hearing judge concluded that Neverdon violated MARPC 1.1 and 1.3 by failing to appear at the March 19, 2018 and July 30, 2018 hearings in the Orphans' Court on the emergency petition. The hearing judge concluded that Neverdon violated MARPC 1.1 by failing to adequately advise the Clients as to management of the Estate. The hearing judge concluded that Neverdon failed to provide any guidance to Michael and Purvey "as to how they should handle two lienholders when the liens were greater than the assets available" and failed to instruct the Clients that they could attempt negotiations with the lienholders or take other legal steps to resolve the matter.

By contrast, the hearing judge concluded that Neverdon did not violate MARPC 1.1 or 1.3 with respect to negotiation of a reduction in the MDH lien. According to the hearing judge, Neverdon attempted to negotiate with MDH about its lien and "arguably, still continues to attempt to negotiate the lien." The hearing judge stated that Bar Counsel had not provided authority that an attorney in a wrongful death or survival action is responsible for "negotiating every debt that the estate may have[.]" According to the hearing judge, Bar Counsel had "not proven that [Neverdon] was responsible for negotiating the MDH

lien." The hearing judge also concluded that Neverdon did not violate MARPC 1.1 or 1.3 by filing the Information Report late. In so concluding, the hearing judge "accept[ed]" the testimony of Chief Judge Lewyn Scott Garrett of the Orphans' Court, who testified that it is not unusual for an information report to be filed late, that a show cause order is sometimes sent as a reminder, and that no adverse action is taken unless a party fails to file the information report after a hearing on the show cause order.

### The Parties' Exceptions

Bar Counsel excepts to the hearing judge's conclusion that Neverdon did not violate MARPC 1.1 and 1.3 with respect to failing to negotiate a reduction or waiver of the MDH lien. Bar Counsel contends that, as the attorney for the Estate, Neverdon "was obligated to act competently and diligently to reduce the" MDH lien, "a task clearly within the scope of the representation." Bar Counsel argues that, on July 14, 2017, MDH provided notice to Neverdon, as the attorney for the Estate, of its lien and, on July 26, 2017, Neverdon, through Lee, advised the Clients that he would negotiate a pay-off of the MDH lien. Bar Counsel asserts that, at the hearing, its expert witness testified that a competent and diligent attorney would have requested from MDH a detailed list of the services rendered, evaluated whether any statute of limitations barred any portion of the MDH lien, and demanded a reduction of the lien pursuant to Maryland Regulations. Bar Counsel maintains that Neverdon did none of these things and instead sent only one letter to MDH requesting a reduction or waiver of the lien and took no further action.

For his part, Neverdon excepts to the hearing judge's conclusion that he violated MARPC 1.1 by failing to investigate matters relevant to the survival action. Neverdon

contends that, although there may have been other or additional methods of investigation, his testimony demonstrated that he investigated, analyzed information he discovered, and considered options on behalf of the Clients and the Estate.  Neverdon also excepts to the hearing judge's conclusion that he violated MARPC 1.1 by failing to attempt to negotiate the reduction or waiver of the CEICO lien.  Neverdon argues that his undisputed testimony revealed he attempted to negotiate the reduction or waiver of the lien, continuing through the disciplinary hearing.  Neverdon states that, as of the date of the exceptions, he has secured a reduction of the CEICO lien from $7,000 to $2,500.  Neverdon excepts to the hearing judge's conclusion that he violated MARPC 1.1 by failing to appear at a hearing in the Orphans' Court and asserts that his uncontroverted testimony demonstrated that he was excused by the Orphans' Court from attending hearings.  Neverdon maintains that his testimony is supported by testimony from the clerk of the Orphans' Court and the Chief Judge of the Orphans' Court, who testified that his presence was excused.

Neverdon also excepts to the hearing judge's conclusion that he violated MARPC 1.3 and contends that he immediately opened the Estate and took steps to institute a claim against Disney's insurance company and to determine what other insurances or monies existed.  Neverdon argues that the late filing of the Information Report did not interfere with the administration of the Estate.  He also asserts that, even through the disciplinary proceedings, he has continued to work with Michael and Purvey to negotiate a reduction of the liens against the Estate.

### Discussion

"An attorney shall provide competent representation to a client.   Competent

representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." MARPC 1.1. "Incompetent representation occurs when an attorney fails to take necessary, fundamental steps in a client's case[,]" and, among other things, may occur where "an attorney fails to appear in court on a client's behalf[.]" Attorney Grievance Comm'n v. Ambe, 466 Md. 270, 288, 218 A.3d 757, 767 (2019) (cleaned up). With respect to estate matters generally, this Court has stated that, once attorneys "choose to insert [themselves] into the estate administration process as counsel . . . , [they are] obligated to do so competently." Attorney Grievance Comm'n v. Woolery, 462 Md. 209, 198 A.3d 835 (2018) (cleaned up).

MARPC 1.3 provides that "[a]n attorney shall act with reasonable diligence and promptness in representing a client."

In this case, we sustain Bar Counsel's exception to the hearing judge's conclusion that Neverdon did not violate MARPC 1.1 and 1.3 by failing to negotiate a reduction or waiver of the MDH lien. The record reflects that Neverdon undertook representation in the survival action, as well as the Estate matter on behalf of the Clients. Although the hearing judge concluded that Neverdon was not obligated to attempt to negotiate every debt in connection with his representation of the Clients, it appears that, in reaching this conclusion, the hearing judge did not take into account that Neverdon was responsible for representing the Clients with respect to the Estate matter as well as the survival action and that Neverdon had advised the Clients that he would attempt to negotiate a reduction of the MDH lien. Just as the hearing judge concluded that Neverdon violated MARPC 1.1 and 1.3 with respect to the failure to attempt to negotiate the CEICO lien, and, in doing so,

recognized that it was Neverdon's responsibility to negotiate the CEICO lien, the same rationale applies with respect to the MDH lien. The record reflects that Neverdon was aware of the MDH lien against the Estate and made a very minimal attempt to negotiate the lien, after advising the Clients that he would attempt to do so. The sole action taken by Neverdon prior to learning from Bar Counsel's expert of the existence of a potentially applicable COMAR regulation was to send the letter of January 10, 2018, requesting a reduction or waiver of the lien. In response to the letter, MDH notified Neverdon via an e-mail to Lee on April 2, 2018 that a waiver or reduction would not be possible, but an allowance could be made for the cost of a headstone if the total cost of the funeral permitted. Neverdon's next contact with MDH came on September 17, 2020, over two and a half years later, as a result of his learning through Bar Counsel's expert of a potentially applicable COMAR regulation. In other words, after learning of the MDH lien and promising to attempt to negotiate a reduction or waiver, Neverdon's sole action for over two and a half years was to send the letter of January 10, 2018.

The existence of the MDH lien in the amount of $19,124.78 was critical because Nationwide had advised that the policy limit was $30,000 and after Neverdon's fee of $10,000 was taken, only $20,000 would have remained of the settlement proceeds to satisfy both the MDH and CEICO liens. In other words, the combination of the liens and Neverdon's fee exceeded the settlement amount. At a minimum, as Bar Counsel's expert testified, Neverdon should have requested from MDH a list of the services comprising the lien amount and made greater efforts to seek a reduction in or waiver of the amount due. For all of these reasons, we sustain Bar Counsel's exception.

We overrule Neverdon's exceptions to the hearing judge's conclusions that he violated MARPC 1.1 and 1.3 by failing to adequately investigate the survival action and negotiate the CEICO lien.[26]  With respect to investigation of the survival action and negotiation of the CEICO lien, the hearing judge's conclusions are supported by clear and convincing evidence.  There is no indication in the record, and Neverdon does not claim in his exceptions, that he interviewed witnesses to the accident.  Similarly, although Daryl Disney was identified as the person insured by Nationwide, there is no indication that Neverdon attempted to investigate any circumstances related to Daryl Disney.  And, in his exceptions, Neverdon acknowledges that he did not review the Reconstruction Report.

As to the CEICO lien, when questioned about his opinion regarding Neverdon's effort to negotiate a reduction of the lien, Bar Counsel's expert witness, Paul Bekman, Esq., observed that he did not see any indication that Neverdon had ever written to CEICO.  In his exceptions, Neverdon advises that, after the disciplinary hearing, CEICO has agreed to reduce its lien from $7,000 to $2,500.  As such, Neverdon confirms in his exceptions that, at the time of the disciplinary hearing, the lien had not been reduced, and does not advise of any specific action on his part to achieve the result.  The hearing judge was not obligated to accept Neverdon's vague and uncorroborated testimony that he attempted to reduce the lien.

---

[26]Also, in his exceptions, Neverdon advises that he opened the Estate immediately and he seemingly excepts to a conclusion that the Information Report was untimely filed. Although Neverdon has raised these issues, a review of the hearing judge's opinion does not reveal a determination that Neverdon violated either MARPC 1.1 or 1.3 by failing to timely open the Estate or by filing the Information Report late.

Overall, Neverdon failed to take necessary and basic steps during the course of the representation to pursue the Clients' case and we overrule his exception with respect to MARPC 1.1 and 1.3.[27]  In addition, although Neverdon raised numerous arguments in his exception to the hearing judge's conclusions as to MARPC 1.1 and 1.3, Neverdon did not challenge the hearing judge's conclusion that he violated MARPC 1.1 and 1.3 by sending the letters of July 26, 2017 and September 6, 2017 to the Clients with incorrect information, a conclusion which is supported by clear and convincing evidence.  Nor did Neverdon except to the hearing judge's conclusion that he violated MARPC 1.1 by failing to recognize the conflict of interest.  As explained below, the hearing judge concluded that Neverdon violated MARPC 1.7 (Conflict of Interest), and the conclusion is supported by clear and convincing evidence.  As such, the hearing judge's conclusion that Neverdon's failure to recognize the conflict of interest constituted a violation of MARPC 1.1 is also supported by clear and convincing evidence.

---

[27]We sustain Neverdon's exception to the hearing judge's conclusion that he violated MARPC 1.1 by failing to appear at two hearings in the Orphans' Court and conclude that there is not clear and convincing evidence supporting the hearing judge's conclusions that Neverdon violated MARPC 1.1 and 1.3 in connection with the hearings. In the findings of fact, the hearing judge expressly found that, as to the March 19, 2018 hearing, Neverdon was explicitly advised by an employee of the Orphans' Court that he did not need to appear.  As to the July 30, 2018 hearing, the hearing judge expressly found that Neverdon had been contacted by a representative of the Orphans' Court and he advised the person that he did not want to proceed with the hearing given that Purvey had signed both the release and settlement check by that time.

## MARPC 1.2(a) (Scope of Representation and Allocation of Authority Between Client and Attorney)

The hearing judge concluded that Neverdon violated MARPC 1.2(a)[28] with respect to the signing of the release by "not abiding by the Clients' desire to not settle the" survival action and the personal representatives' refusal to sign the release, and instead "proceed[ing] on a course of action apparently designed to coerce the Clients into settling the matter."  Neverdon does not expressly except to the hearing judge's conclusion that he violated MARPC 1.2(a) in the manner described above.  Instead, unlike with other exceptions to the hearing judge's conclusions of law, where Neverdon expressly states that he "takes exception[,]" here, Neverdon references MARPC 1.2 without specifically mentioning the hearing judge's conclusions or an exception thereto and provides his views about matters related to the settlement and his representation of the Clients.  Among other things, Neverdon observes that Michael accepted the settlement offer after it was communicated to him (Michael) that an investigation of whether the insurance policy had a value of $100,000 was not fruitful.

 To the extent that Neverdon's remarks may be viewed as an exception, we overrule it.  It is undisputed that Lee met with the Clients on September 1, 2017 regarding having

---

[28]MARPC 1.2(a) provides in relevant part:

[A]n attorney shall abide by a client's decisions concerning the objectives of the representation and, when appropriate, shall consult with the client as to the means by which they are to be pursued.  An attorney may take such action on behalf of the client as is impliedly authorized to carry out the representation.  An attorney shall abide by a client's decision whether to settle a matter.

the personal representatives sign the release.  As the hearing judge pointed out, the facts are also undisputed that the personal representatives refused, at that time, to sign the release, and that the letter of September 6, 2017 was sent to the Clients containing inaccurate legal information in an attempt to persuade the Clients to settle.  Indeed, the hearing judge determined that the letter "contained legal inaccuracies that likely misled the Clients as to how they should proceed and, thereby, exerted pressure on the Clients to settle."  We agree.  Clear and convincing evidence supports the hearing judge's conclusion that Neverdon violated MARPC 1.2(a).

### MARPC 1.4 (Communication)

Without specifying a subsection, the hearing judge concluded that Neverdon violated MARPC 1.4 by failing to provide information to the Clients "about what investigative steps had not yet been taken" at the time that he presented Nationwide's settlement offer, as that information "was reasonably necessary for the Clients to make an informed decision regarding the settlement offer."  The hearing judge also concluded that Neverdon violated MARPC 1.4 by providing incorrect legal information to the Clients in the July 26, 2017 and September 6, 2017 letters, which "prevented the Clients from making informed decisions regarding the settlement."  And, the hearing judge concluded that Neverdon violated MARPC 1.4 as to his communications with the Clients about how to handle the MDH and CEICO liens, as Neverdon provided "the Clients essentially zero guidance on how to handle the payment of the liens, other than to tell the Clients that the

lienholders were legally entitled to be paid."[29]

Again, without indicating that he is excepting, Neverdon provides information that appears to contradict the hearing judge's conclusion that he violated MARPC 1.4.  Among other things, Neverdon states that he "made great efforts in communicating with" the Clients by phone, e-mail, through letters, and, as to Purvey, by making house calls.  Overall, Neverdon provides general information about actions he and Lee took to communicate with the Clients and particularly Purvey, such as providing their cell phone numbers and through other contact.  In his remarks, Neverdon does not discuss the conclusion that he violated MARPC 1.4 by providing incorrect legal information in the letters of July 26, 2017 and September 6, 2017.  To the extent that Neverdon excepts to the hearing judge's conclusion that he violated MARPC 1.4, we overrule the exception.

MARPC 1.4 provides:

(a) An attorney shall:

(1) promptly inform the client of any decision or circumstance with

---

[29]By contrast, the hearing judge concluded that Neverdon did not violate MARPC 1.4 by communicating with the Clients mainly through Lee, his paralegal, in communicating with Purvey about the emergency petition, and by not telling the Clients that he was not going to appear at the March 19, 2018 or July 30, 2018 hearings in the Orphans' Court.  In addition, the hearing judge concluded that Neverdon did not violate MARPC 1.4 by refusing to speak with Brown, a person who had been assisting Purvey and for whom there was no indication that Neverdon had been authorized by the Clients to speak with, and as to his communications with Purvey about the status of the MDH lien.  The latter determination appears to have been based on the hearing judge's conclusion that the negotiation of the MDH lien was outside the scope of representation.  As previously explained, we disagree with the hearing judge's conclusion that negotiating a reduction or waiver of the MDH lien was outside the scope of Neverdon's representation of the Clients.  In any event, Bar Counsel does not except to the hearing judge's conclusions that Neverdon did not violate MARPC 1.4 with respect to the above matters.  As such, we do not address whether these conclusions are supported by clear and convincing evidence.

respect to which the client's informed consent, as defined in Rule 19-301.0
(f) (1.0), is required by these Rules;

> (2) keep the client reasonably informed about the status of the matter;
> (3) promptly comply with reasonable requests for information; and
> (4) consult with the client about any relevant limitation on the
attorney's conduct when the attorney knows that the client expects assistance
not permitted by the Maryland Attorneys' Rules of Professional Conduct or
other law.

(b) An attorney shall explain a matter to the extent reasonably necessary to
permit the client to make informed decisions regarding the representation.

Clear and convincing evidence supports the hearing judge's conclusion that
Neverdon violated MARPC 1.4.  Namely, Neverdon violated MARPC 1.4(a)(2) and 1.4(b)
by failing to inform the Clients concerning the status of his investigation of the case at the
time Nationwide's settlement offer was presented, providing incorrect legal information to
the Clients in the July 26, 2017 and September 6, 2017 letters, and failing to advise the
Clients about how to handle the pending liens.  With this conduct, Neverdon did not keep
the Clients reasonably informed about the status of the case or provide information that
would assist the Clients in making informed decisions about the case.  Knowing where the
investigation of the case stood and having accurate legal information about the potential
settlement of the case would have been necessary for the Clients to make an informed
decision about whether to accept Nationwide's settlement offer.  Neverdon's conduct
plainly violated MARPC 1.4(a)(2) and 1.4(b).

## MARPC 1.5 (Fees)

In the Petition for Disciplinary or Remedial Action, Bar Counsel charged Neverdon
with violating MARPC 1.5(b) and (c), yet the hearing judge did not address either of the

charged violations and instead concluded that Neverdon violated MARPC 1.5(a).[30]

_____

[30]MARPC 1.5 provides in pertinent part:

(a) An attorney shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the attorney;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the attorney or attorneys performing the services; and
(8) whether the fee is fixed or contingent.

(b) The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation, except when the attorney will charge a regularly represented client on the same basis or rate. Any changes in the basis or rate of the fee or expenses shall also be communicated to the client.

(c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by section (d) of this Rule or other law. A contingent fee agreement shall be in a writing signed by the client and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the attorney in the event of settlement, trial or appeal; litigation and other expenses to be deducted from the recovery; and whether such expenses are to be deducted before or after the contingent fee is calculated. The agreement must clearly notify the client of any expenses for which the client will be responsible whether or not the client is the prevailing party. Upon conclusion of a contingent fee matter, the attorney shall provide the client with a written

According to the hearing judge, this conclusion was based on Neverdon "taking his full fee before his work had been completed." For his part, without identifying a specific subsection, Neverdon excepts to the hearing judge's conclusion that he violated MARPC 1.5 and states that MARPC "1.5(c) allows for contingency fee agreements in personal injury cases" and that the fee in the case "was not an unreasonable fee on its face and under the contract it was earned at the time of settlement."

We decline to sustain the hearing judge's conclusion of a violation of MARPC 1.5(a) as Neverdon was not charged with violating the subsection. There is no indication that the hearing found a violation of MARPC 1.5(b) or (c), the subsections with which Neverdon was charged. Hence, there is no violation of MARPC 1.5 that is sustained.

## MARPC 1.7 (Conflict of Interest)

The hearing judge concluded that Neverdon violated MARPC 1.7. The hearing judge determined that an actual conflict of interest arose when, on or about September 19, 2017, Michael signed the release, but Purvey still refused to sign the release. The hearing judge explained that, at that point, there was a significant risk that representing Michael and his desire to settle the case would limit Neverdon's ability to represent Purvey and her desire to continue with the survival action and hold Disney accountable. The hearing judge stated that Neverdon never obtained informed consent, confirmed in writing from Michael or Purvey, to continue with the representation. In addition, the hearing judge concluded that, in filing the emergency petition to remove Purvey as a personal representative,

---

statement stating the outcome of the matter, and, if there is a recovery, showing the remittance to the client and the method of its determination.

Neverdon "put the Clients 'directly adverse' to each other, further exacerbating [Neverdon]'s failure to properly advise the Clients and obtain their written consent."

Neverdon excepts to the hearing judge's conclusion that he violated MARPC 1.7 and contends that the Clients' interests were aligned. Neverdon argues that the circumstance that Purvey wanted Disney to be prosecuted, a matter beyond his control, did not change the common interest shared by the Clients concerning settlement. Neverdon asserts that, even when he requested that the Orphans' Court "intervene for the purpose of instructing [] Purvey to do her job as personal representative and execute the Release and the check to be brought into the Estate, this was for the benefit of all the [Clients] equally, even [] Purvey." We overrule the exception.

MARPC 1.7 provides:

(a) Except as provided in section (b) of this Rule, an attorney shall not represent a client if the representation involves a conflict of interest. A conflict of interest exists if:

     (1) the representation of one client will be directly adverse to another client; or
     (2) there is a significant risk that the representation of one or more clients will be materially limited by the attorney's responsibilities to another client, a former client or a third person or by a personal interest of the attorney.

(b) Notwithstanding the existence of a conflict of interest under section (a) of this Rule, an attorney may represent a client if:

     (1) the attorney reasonably believes that the attorney will be able to provide competent and diligent representation to each affected client;
     (2) the representation is not prohibited by law;
     (3) the representation does not involve the assertion of a claim by one client against another client represented by the attorney in the same litigation or other proceeding before a tribunal; and
     (4) each affected client gives informed consent, confirmed in writing.

- 49 -

Clear and convincing evidence supports the hearing judge's conclusion that Neverdon violated MARPC 1.7, as it is plain that a conflict of interest developed, at the latest, when Michael signed the release in pursuit of settlement and Purvey refused to sign the release. At this point, the Clients' interests were directly adverse with respect to management of the release and settlement. At the time, Neverdon's representation of Purvey would have involved advising her with respect to whether she could or should in fact refuse to accept the settlement and not sign the release; in contrast, Neverdon's representation of Michael involved Michael's desire to have the case settled as soon as possible. Although the conflict of interest existed, notwithstanding the conflict, Neverdon could have proceeded under MARPC 1.7(b) to obtain each Client's informed consent, confirmed in writing if he believed he was able to provide competent and diligent representation to each Client. Neverdon failed to do so. In addition, as the hearing judge concluded, undoubtedly a conflict of interest existed at the time Neverdon filed the emergency petition to remove Purvey as a co-personal representative. We are satisfied that clear and convincing evidence supports the hearing judge's conclusion that Neverdon's conduct violated MARPC 1.7.

## MARPC 1.15 (Safekeeping Property)

The hearing judge concluded that Neverdon violated MARPC 1.15(a) by failing to create and maintain required documents relating to client funds in his possession, namely, that Neverdon failed to retain a copy of the check that he wrote for his attorney's fees and that he failed to produce notes that he had indicated that he kept on the client file regarding

funds that "had come in and gone out[.]"  The hearing judge concluded that Neverdon violated MARPC 1.15(d) by failing to provide notice to MDH and CEICO that settlement proceeds had been received.

By contrast, the hearing judge concluded that Bar Counsel had failed to prove that Neverdon violated MARPC 1.15(e).  The hearing judge observed that Bar Counsel had alleged that Neverdon distributed settlement proceeds despite the circumstance that lienholders had an interest in the funds.  Before the hearing judge, Neverdon had contended that, because the check for the settlement proceeds was never cashed, he had not disbursed the funds and he asserted that he followed the Orphans' Court's rules.  Because the check had never been cashed and because Bar Counsel had not rebutted Neverdon's assertion that he complied with the Orphans' Court's requirements, the hearing judge declined to conclude that Neverdon had violated MARPC 1.15(e).

Bar Counsel excepts to the hearing judge's conclusion that Neverdon did not violate MARPC 1.15(e) and contends that Neverdon indeed violated the subsection by disbursing disputed funds.  Specifically, Bar Counsel argues that, at the time the settlement funds were received, Neverdon knew that MDH and CEICO had asserted liens, yet he disbursed the funds to Purvey, and thereby failed to safekeep the disputed funds.  Bar Counsel asserts that "[t]he hearing judge incorrectly reasoned that [Neverdon] did not violate [MARPC] 1.15(e) because [] Purvey refused to cash or deposit the check."  Stated otherwise, Bar Counsel maintains that Neverdon's "misconduct is not negated by the fact that [] Purvey refused to negotiate the check."

Without specifying a subsection, Neverdon states that he excepts to the hearing

- 51 -

judge's conclusion regarding MARPC 1.15.  In explaining the exception, Neverdon does not address the hearing judge's conclusion that he violated MARPC 1.15(a) by failing to create and maintain records and MARPC 1.15(d) by not notifying the lienholders of the receipt of settlement proceeds.  Instead, Neverdon explains the circumstances of the alleged MARPC 1.15(e) violation, the violation that the hearing judge did not find.  Neverdon contends that he testified that the $20,000 in settlement funds remain in his attorney trust account, that negotiations for the reduction of the liens were ongoing, and that there had been no failure to safekeep the funds.

We overrule Bar Counsel's exception to the hearing judge's failure to find that Neverdon violated MARPC 1.15(e).  To the extent that Neverdon may have intended to except to the hearing judge's conclusions that he violated MARPC 1.15(a) and (d), we overrule the exception.

MARPC 1.15 provides in relevant part:

(a) An attorney shall hold property of clients or third persons that is in an attorney's possession in connection with a representation separate from the attorney's own property.  Funds shall be kept in a separate account maintained pursuant to Title 19, Chapter 400 of the Maryland Rules, and records shall be created and maintained in accordance with the Rules in that Chapter.  Other property shall be identified specifically as such and appropriately safeguarded, and records of its receipt and distribution shall be created and maintained.  Complete records of the account funds and of other property shall be kept by the attorney and shall be preserved for a period of at least five years after the date the record was created.

(d) Upon receiving funds or other property in which a client or third person has an interest, an attorney shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, an attorney shall deliver promptly to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall render promptly a full

accounting regarding such property.

(e) When an attorney in the course of representing a client is in possession of property in which two or more persons (one of whom may be the attorney) claim interests, the property shall be kept separate by the attorney until the dispute is resolved.  The attorney shall distribute promptly all portions of the property as to which the interests are not in dispute.

Here, we decline to disturb the hearing judge's conclusion that Neverdon did not violate MARPC 1.15(e).  Neverdon provided two explanations as to why his conduct did not violate MARPC 1.15(e)—that Purvey did not cash the settlement check and that disbursement of the check to Purvey to deposit in an estate account was in accord with rules of the Orphans' Court.  We give no credence to Neverdon's first explanation that Purvey's failure to cash the check alone negates a violation of MARPC 1.15(e).  The circumstance that Purvey did not cash the check does not negate Neverdon's conduct in releasing the funds to Purvey for Purvey to make use of if she chose to despite the lienholders' interest in the funds.  It is the second part of Neverdon's explanation—his unrebutted testimony that, in an Orphans' Court case, where there are lienholders, settlement funds should be placed in an estate account and disbursed to lienholders from the estate account—that causes us not to sustain Bar Counsel's exception.  Although Bar Counsel's expert witness, Bekman, was not specifically asked about the propriety of disbursing the settlement check, in discussing the reasonableness of Neverdon's fee, Bekman stated that Neverdon "was to collect the $30,000 check, charge a $10,000 fee and leave the family, who had no experience with anything, with $26,024.48 worth of bills, and $20,000 that was going into an estate account."  In other words, in his testimony, Bekman raised no concern about the $20,000 potentially going into an estate account, even though

there were liens from MDH and CEICO, of which he was aware.  MARPC 1.15(e) requires an attorney to not distribute portions of funds/property that are in dispute, but to the extent that Neverdon gave uncontradicted testimony that the settlement funds, including any amounts due to the lienholders, should have been placed in an estate account and Bar Counsel's expert witness's testimony appears not to gainsay this, we decline to overturn the hearing judge's conclusion that Neverdon did not violate MARPC 1.15(e).

On the other hand, clear and convincing evidence supports the hearing judge's conclusions that Neverdon violated MARPC 1.15(a) and (d).  Although Neverdon excepts in general to the finding of a violation of MARPC 1.15, in his exceptions, Neverdon does not specifically address the violation of either MARPC 1.15(a) or (d).  The record is clear that Neverdon did not produce a copy of the check that he wrote to himself for his $10,000 fee and he did not produce records of any notes that allegedly were made in the client file with respect to the receipt or disbursal of funds in the case.  MAPRC 1.15(a) requires that an attorney create and preserve records of attorney trust account funds and other property.

In addition, the record is clear that Neverdon did not notify either of the lienholders about the settlement.  In other words, he did not provide the lienholders with notice of receipt of the settlement funds.  Although we do not conclude that Neverdon violated MARPC 1.15(e) in issuing the settlement check to Purvey, Neverdon was nonetheless well aware of the existence of the lienholders, MDH and CEICO, and their interest in the funds.  MARPC 1.15(d) requires that an attorney promptly notify third persons upon receipt of funds or other property in which the third person has an interest.  The circumstance that the funds may have been distributed to the lienholders through the administration of the

Estate did not relieve Neverdon of the obligation to notify the lienholders of his receipt of the funds in which the lienholders alleged an interest.

### MARPC 1.16 (Declining or Terminating Representation)

The hearing judge concluded that Neverdon violated MARPC 1.16(a) by continuing to represent the Clients when it became apparent that the representation would violate MARPC 1.7.  The hearing judge determined that an actual conflict of interest arose between the Clients, that Neverdon failed to obtain informed consent, confirmed in writing from the Clients to continue the representation, and that Neverdon's continued representation violated MARPC 1.7.

Neverdon excepts to the hearing judge's conclusion that he violated MARPC 1.16, but provides an explanation that addresses the circumstances of MARPC 1.16(d)[31] and does not address MARPC 1.16(a).

MARPC 1.16(a)(1) provides: "Except as stated in section (c) of this Rule, an attorney shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if: (1) the representation will result in violation of the Maryland Attorneys' Rules of Professional Conduct or other law[.]"  (Paragraph break omitted).  In this case, Neverdon's continued representation, without withdrawal, of the Clients despite the conflict of interest, in violation of MARPC 1.7, as the hearing judge

---

[31]Although the hearing judge concluded that Neverdon violated MARPC 1.16(d), which concerns an attorney's obligation to take steps to reasonably protect a client's interests upon termination of representation, Neverdon was not charged in the Petition for Disciplinary or Remedial Action with a violation of MARPC 1.16(d).  We, therefore, do not sustain the violation.

concluded, constitutes a violation of MARPC 1.16(a)(1).  As such, the hearing judge's determination is supported by clear and convincing evidence.

### MARPC 3.3(a)(1) (Candor Toward the Tribunal) and MARPC 8.4(c) (Dishonesty, Fraud, Deceit, or Misrepresentation)

The hearing judge determined that Neverdon violated MARPC 3.3(a)(1) by making false statements of material fact in the October 10, 2018 letter in response to Bar Counsel and that Neverdon violated MARPC 3.3(a)(1) and MARPC 8.4(c) by making false statements of material fact while testifying at the disciplinary hearing.

The hearing judge concluded that Neverdon did not violate MARPC 3.3(a)(1) in connection with his response to the show cause order that the Orphans' Court issued on June 7, 2017 or the emergency petition by stating, among other things, that Purvey suffers from various serious health conditions.  The hearing judge determined that Neverdon did not violate MARPC 3.3(a)(1) with respect to some statements in the October 10, 2018 and April 11, 2019 letters responding to Bar Counsel.  In addition, the hearing judge concluded that Neverdon did not violate MARPC 3.3(a)(1) or MARPC 8.4(c) in connection with the submission of a false signature (Purvey's) on the Information Report filed with the Register of Wills.  Both Bar Counsel and Neverdon have various exceptions to the hearing judge's conclusions.  We resolve the matter as follows.

To the extent that the hearing judge concluded that Neverdon made false statements in his October 10, 2018 letter to Bar Counsel, while this conduct may potentially violate MARPC 8.1(a) and 8.4(c), this conduct would not violate MARPC 3.3(a)(1) as MARPC 3.3(a)(1) concerns making or failing to correct false statements of material fact made to a

tribunal.

Similarly, to the extent that the hearing judge concluded that Neverdon violated MARPC 3.3(a)(1) and MARPC 8.4(c) by making false statements while testifying at the disciplinary hearing, we do not sustain those violations.  In In Re Ruffalo, 390 U.S. 544, 551 (1986), the Supreme Court stated that, with respect to attorney disciplinary proceedings, "[t]he charge must be known before the proceedings commence."  The Supreme Court explained that such proceedings "become a trap when, after they are underway, the charges are amended on the basis of testimony of the accused."  Id.  The Supreme Court stated that "notice should be given to the attorney of the charges and opportunity afforded him for explanation and defen[s]e."  Id. at 550.  The Supreme Court concluded that the "absence of fair notice as to the reach of the grievance procedure and the precise nature of the charges deprive[ an attorney] of procedural due process."  Id. at 552.  In Attorney Grievance Comm'n v. Patton, 432 Md. 359, 378, 69 A.3d 11, 22 (2013), citing Ruffalo, we sustained Bar Counsel's exception to the hearing judge's conclusions that an attorney's misrepresentation of facts during his deposition violated Maryland Lawyers' Rules of Professional Conduct ("MLRPC") 8.1(a), 8.4(c), and 8.4(d) because the matters had not been charged or did not constitution violations of the MLRPC.  See also Attorney Grievance Comm'n v. Frank, 470 Md. 699, 733, 236 A.3d 603, 624 (2020).

In this case, consistent with the case law above, Bar Counsel acknowledges that Neverdon's testimony at the disciplinary hearing cannot form the basis of a violation of MARPC 3.3(a)(1) or MARPC 8.4(c), but argues that the testimony should nonetheless be considered as an aggravating factor.  For all of the reasons above, we do not sustain the

hearing judge's conclusions that Neverdon violated MARPC 3.3(a)(1) by making false statements to Bar Counsel and violated MARPC 3.3(a)(1) and MARPC 8.4(c) by testifying falsely at the disciplinary hearing.[32]

Bar Counsel excepts, though, to the hearing judge's conclusion that Neverdon "should not be held liable" for the forgery of Purvey's signature on the Information Report filed with the Orphans' Court, *i.e.*, that Neverdon did not violate MARPC 3.3(a)(1) or 8.4(c) with respect to the forged signature. We overrule Bar Counsel's exception. In the conclusions of law, the hearing judge carefully summarized the relevant testimony and concluded that Purvey's signature was, indeed, false but that Neverdon could not be held responsible for the forgery, which was done by Lee. The hearing judge observed the following. Purvey testified that she did not sign the Information Report but indicated that the signature on it looked like hers. Brown testified that Purvey could not have signed the Information Report because Purvey had not met with Neverdon or Lee during the relevant time. Brown testified that the signature on the Information Report looked to her to be a "cut and paste" copy of Purvey's signature.

Lee testified that he signed Purvey's name on a copy of the Information Report and identified Petitioner's Exhibit 108, an incomplete copy of the Information Report, as the document. Lee testified that he had received permission from Purvey to sign the

---

[32]Bar Counsel did not except to the hearing judge's conclusion that Neverdon did not violate MARPC 3.3(a)(1) in connection with his response to the show cause order from the Orphans' Court or the emergency petition or certain statements in his letters responding to Bar Counsel. We agree with the hearing judge that Neverdon did not violate MARPC 3.3(a)(1) in this manner.

Information Report on her behalf.  Lee also testified that he found a version of the Information Report in the client file that contained Purvey's "live" signature and that he filed that version with the Orphans' Court.[33]  For his part, Neverdon testified that, when he learned of the allegation of forgery, he searched the client file and found two versions of the Information Report—one that Lee had signed for Purvey and one that Purvey had signed "early on."  Neverdon testified that he asked Lee about the different versions and Lee explained the "mix-up."

The hearing judge found that Purvey did not sign any version of the Information Report.  The hearing judge found that Lee did not have Purvey's permission to sign her name on the Information Report given Purvey's unequivocal testimony that she did not give Lee permission to sign her name.  The hearing judge discussed Lee's notes documenting his efforts to obtain signatures on the Information Report and the absence of any note indicating that Purvey had given Lee permission to sign her name.  The hearing judge concluded that Lee's testimony and notes indicated that "Lee felt pressure to file the Information Report and 'cut some corners' once he had a copy of the Information Report signed by" Michael.  The hearing judge stated that the conclusion that Lee forged Purvey's signature was supported by the factual finding that the List of Interested Persons filed in the Orphans' Court by Lee also contained one or more false signatures.  The hearing judge concluded that a close examination of the Information Report "reveals that something is

---

[33]The hearing judge noted that, on cross-examination, when asked why he did not mention the "live" signature in his affidavit attached to the April 11, 2019 response letter that Neverdon sent to Bar Counsel, Lee testified that his affidavit was meant to counter Purvey's allegation that her signature had been forged.

clearly 'off' about the signature and signature block." The hearing judge observed that on different versions of the Information Report, including Petitioner's Exhibit 42 and Respondent's Exhibit 12A, there are marks to the left of the signature and the typed name under "Purvey's signature is clearly skewed to the left, especially when compared to the typed names under" Michael's and Neverdon's signatures. The hearing judge concluded that "[t]his certainly gives the appearance that the signature was affixed to the document, either manually or electronically, as suggested by [] Brown."

Having determined that Purvey's signature on the Information Report "was not genuine," the hearing judge addressed whether Neverdon "should be held responsible" for the Information Report being filed with the forged signature and concluded that Neverdon could not be. The hearing judge determined that there was no evidence that Neverdon ordered Lee to falsify Purvey's signature or that he was aware of the falsification and ratified it. The hearing judge concluded that there was no evidence that Neverdon learned about the wrongdoing until well after the forgery occurred. The hearing judge specifically concluded that the evidence indicated that Neverdon did not learn of the falsification until Bar Counsel provided him with a copy of Purvey's complaint on September 19, 2018.

In excepting to the hearing judge's failure to find that Neverdon violated MARPC 3.3(a)(1) and MARPC 8.4(c), Bar Counsel contends that the hearing judge was correct in finding that Lee falsified Purvey's signature on the Information Report and that Neverdon learned of the forgery by September 19, 2018. Bar Counsel argues, though, that, even as of the date of the hearing, the Estate was still open and Neverdon had not withdrawn his appearance and he had failed to take any action to correct the forged signature. Bar Counsel

asserts that MARPC 3.3(b) provides that the duties set forth in MARPC 3.3(a) "continue to the conclusion of the proceeding," and that Neverdon had a duty to correct Lee's misrepresentation to the Orphans' Court.

On the other hand, Neverdon contends that it is "wild conjecture" that Purvey's signature on the Information Report was forged. Neverdon argues rather "that the Information Report filed was the original signature of [] Purvey and was not a cut and paste." Neverdon asserts that Respondent's Exhibit 12A does not have a stray line (*i.e.*, the line mentioned by the hearing judge) and that it was the copy of the Information Report actually filed bearing Purvey's original signature.

MARPC 3.3(a)(1) provides that "[a]n attorney shall not knowingly: [] make a false statement of law or fact to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the attorney[.]" (Paragraph break omitted). MARPC 8.4(c) provides that "[i]t is professional misconduct for an attorney to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]" In Attorney Grievance Comm'n v. Steinhorn, 462 Md. 184, 198-99, 198 A.3d 821, 829 (2018), we observed that "[t]here is a significant overlap between M[A]RPC 3.3(a)(1) and 8.4(c). Indeed, a lawyer that violates M[A]RPC 3.3(a) generally violates M[A]RPC 8.4(c) as well." (Cleaned up).

In Attorney Grievance Comm'n v. Berry, 437 Md. 152, 186, 85 A.3d 207, 228 (2014), this Court concluded that an attorney violated MLRPC 3.3(a)(1) where the attorney, "in three Petitions for Allowance of Interim Personal Representative Commission and Interim Attorney's Fees, filed over seven years with the Orphans' Court, failed to

disclose the numerous unauthorized payments he made to himself."   In addition, the attorney filed in the Orphans' Court nine "Accounts of Successor Personal Representative" in which he omitted check numbers, misidentified payees on checks, and falsified accounts and balances to reconcile each account.   Id. at 186, 85 A.3d at 228.   We stated that the attorney's "deceit in concealing payments to himself from [an e]state is present in each of the [nine] accounts, which he never corrected, all in violation of" MLRPC 3.3.   Id. at 186, 85 A.3d at 228.

Similarly, in Attorney Grievance Comm'n v. Bleecker, 414 Md. 147, 169-70, 994 A.2d 928, 941-42 (2010), this Court sustained Bar Counsel's exception to the hearing judge's conclusion that an attorney did not violate MLRPC 3.3(a)(1) where the attorney made no attempt to correct a misstatement in a complaint concerning the date of an automobile accident.   See id. at 169-70, 994 A.2d at 941.   We determined that the attorney misled the trial court, "which relied upon his allegation of [an] accident date in denying the defendant's motion to dismiss and motion to reconsider[,]" and we observed that MLRPC 3.3(a)(1) "states that it is a violation for a lawyer to 'fail to correct a false statement' to the court[.]"   Id. at 170, 994 A.2d at 942 (cleaned up).

In this case, the hearing judge was correct in concluding that there was not clear and convincing evidence that Neverdon violated MARPC 3.3(a)(1) or MARPC 8.4(c) with respect to the forged signature, but not for the reasons advanced by Neverdon.   As explained above, the hearing judge performed a thorough analysis of the testimony and evidence and came to the conclusion that Purvey's signature was, indeed, forged on the Information Report by Lee.   Although Neverdon argues that this was an erroneous

conclusion, we are not convinced that the hearing judge's conclusion that the signature was forged is error.  Purvey testified without hesitancy that she did not give Lee permission to sign her name on the Information Report.  Neverdon's theory seemed to be that, even though Purvey did not give her permission to have her name signed on an Information Report, she had signed an earlier version of the Information Report, which Lee filed with the Register of Wills.  The hearing judge rejected this theory and accepted Purvey's testimony that she had not signed the Information Report and did not find the testimony that she had signed an earlier version credible.

That said, the hearing judge determined that Neverdon only became aware of the alleged forgery on September 19, 2018, upon receipt of Purvey's complaint from Bar Counsel, *i.e.*, after the Information Report had been filed.  This determination is supported by clear and convincing evidence as the record reflects that Lee alone interacted with Purvey in an attempt to obtain her signature on the Information Report.  Bar Counsel's primary contention is that Neverdon failed to correct the forgery after learning of the complaint.  Although it is clear that MARPC 3.3(a)(1) and (b) impose a continuing duty to correct a false statement of material fact previously made to the tribunal by an attorney, in this case, the information that Neverdon received in September 2018 was that there was an allegation that Purvey's signature had been forged.  There is no evidence in the record that Lee acknowledged the forgery to Neverdon in September 2018 and, indeed, Neverdon continues to maintain that Lee did not forge Purvey's signature.  To be sure, our case law confirms that an attorney has a duty to correct a false statement of material fact to a tribunal where the attorney knows that a false statement exists.  See Berry, 437 Md. at 186, 85 A.3d

at 228; <u>Bleecker</u>, 414 Md. at 170, 994 A.2d at 942.  The distinguishing factor here is that Neverdon was not personally responsible for the forgery and Lee denied the forgery, and until the hearing judge's determination that Lee in actuality forged Purvey's signature, the issue had been (and still is) contested by Neverdon.  Because it has not been determined by clear and convincing evidence that, as of September 19, 2018, when Neverdon received the complaint, he indeed knew of Lee's forgery, we do not sustain Bar Counsel's exception to the hearing judge's conclusion.

### MARPC 5.3(b) (Responsibilities Regarding Non-Attorney Assistants)

The hearing judge concluded that Neverdon violated MARPC 5.3(b) by failing to adequately supervise Lee, his paralegal.  The hearing judge concluded that it was fair to state that Lee "ran" Neverdon's law office, as Lee had permission to sign Neverdon's name to letters and pleadings, Lee was the direct contact for the Clients and met with the Clients at times when legal advice was needed, and Lee was authorized to issue demand letters and to negotiate with insurance companies and lienholders.  The hearing judge stated that "[t]his over-permissive arrangement, coupled with a lack of direct oversight, resulted in an environment where . . . corners were cut and rules were broken."

Without identifying a specific subsection, Neverdon excepts to the hearing judge's conclusion that he violated MARPC 5.3.  Neverdon contends that, although he utilized Lee's services as his paralegal in the law office on all client matters, there was no testimony, expert or otherwise, that such a practice was improper or that any of the witnesses misunderstood that Lee was a paralegal and an assistant.  Neverdon argues that he reviewed and approved everything that Lee did, that Lee sent all documents to him first

for review and approval, and that Lee worked at his direction.  Neverdon asserts that,

although at the time he had Lee sign his (Neverdon's) name to certain documents, Lee

signed with his consent.  We overrule Neverdon's exception to the hearing judge's

conclusion that he violated MARPC 5.3(b).

MARPC 5.3(b) provides: "With respect to a non-attorney employed or retained by

or associated with an attorney . . . an attorney having direct supervisory authority over the

non-attorney shall make reasonable efforts to ensure that the person's conduct is

compatible with the professional obligations of the attorney[.]"  (Paragraph breaks

omitted).

In Attorney Grievance Comm'n v. Smith, 443 Md. 351, 367, 116 A.3d 977, 986

(2015), we determined that an attorney violated MLRPC 5.3(a) and (b).  We explained:

> Instead of establishing reasonable measures to ensure that [the paralegal]'s
> conduct complied with his ethical obligations, [the attorney] delegated to [the
> paralegal] broad authority to act on his behalf with little supervision—such
> as permitting [the paralegal] to negotiate with insurance companies and to
> obtain consent from clients to settle.  He apparently relied on [the paralegal]
> to run his practice with little to no supervision or effort to ensure that she
> actually performed the tasks delegated to her in a manner consistent with his
> ethical obligations.

Id. at 367-68, 116 A.3d at 986-87 (citation omitted).

It is clear that Neverdon did not adequately supervise Lee and did not ensure that

Lee's conduct was compatible with an attorney's professional obligations.  Among other

things, as determined by the hearing judge, Lee was authorized to issue demand letters and

negotiate with insurance companies and lienholders, and Lee was authorized to meet with

the Clients at times when legal advice "was imperative," including with respect to the

signing of the release.  Lee issued the demand letter under his signature without knowing the policy limit amount.  Lee was responsible for meeting with Purvey and Michael in an effort to have the release signed, at a time when the need to provide legal advice could have been anticipated, and Lee would have had firsthand knowledge of the conflict of interest that arose between the two, but in the absence of proper supervision from Neverdon failed to recognize it.  Lee sent the letters of July 26, 2017 and September 6, 2017, containing incorrect legal advice to the Clients.  And, of course, Lee forged Purvey's signature on the Information Report.  The hearing judge concluded that Lee had permission to sign Neverdon's name to letters and pleadings and there was very little time in which Neverdon and Lee were even in the office at the same time.  All of this leads to the determination that clear and convincing evidence supports the hearing judge's conclusion that Neverdon violated MARPC 5.3(b) by delegating broad authority to Lee without ensuring that Lee's conduct comported with required ethical standards.[34]

### MARPC 5.5(a) (Unauthorized Practice of Law)

The hearing judge concluded that Neverdon violated MARPC 5.5(a) by directing

---

[34]Prior to addressing any of the specific violations of the MARPC, in the conclusions of law, the hearing judge discussed MARPC 5.3(c).  MARPC 5.3(c) concerns an attorney's responsibility for the conduct of a non-attorney assistant that would be a violation of the MARPC if engaged in by an attorney.  The hearing judge stated: "[T]he Court finds, by clear and convincing evidence, that [Neverdon] ordered or ratified all of the correspondence and pleadings at issue in this case and is, therefore, responsible for their content and effect."  Later, in discussing the violation of MARPC 5.3 in the conclusions of law, though, the hearing judge did not find a violation of MARPC 5.3(c) and in summarizing the MARPC violations that Neverdon was found to have committed, the hearing judge did not include MARPC 5.3(c).  Therefore, it appears that the hearing judge did not conclude that Neverdon violated MARPC 5.3(c).

Lee to: (1) sign, under his own signature, a demand letter containing legal assertions; (2) communicate directly with insurers, despite the existence of legal issues concerning the availability of personal injury protection coverage and the content of a settlement release; (3) communicate directly with the Clients, even concerning legal issues, including the issues discussed in the September 6, 2017 letter; and (4) communicate directly with MDH to negotiate the waiver or reduction of its lien.

Neverdon excepts to the hearing judge's conclusion that he violated MARPC 5.5(a) and contends that Lee did not practice law and that none of the Clients believed that Lee "was doing anything except assisting" him as a paralegal, not as an attorney. Neverdon acknowledges that Lee communicated directly with insurers in the case but argues that Lee did so only at his direction and passed on his (Neverdon's) "communication as he was instructed to do." We overrule Neverdon's exception.

MARPC 5.5(a) provides: "An attorney shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so." In Attorney Grievance Comm'n v. Maldonado, 463 Md. 11, 43, 203 A.3d 841, 859 (2019), we explained that, "[t]o determine whether an individual has engaged in the practice of law, the focus of the inquiry should be on whether the activity in question required legal knowledge and skill in order to apply legal principles and precedent." (Cleaned up). Engaging in the "unauthorized practice of law includes utilizing legal education, training, and experience to apply the special analysis of the profession to a client's problem." Id. at 43, 203 A.3d at 859 (cleaned up). As an example, "[w]here trial work is not involved but the preparation of legal documents, their interpretation, the giving

of legal advice, or the application of legal principles to problems of any complexity, is involved, these activities are still the practice of law." Id. at 43, 203 A.3d at 859 (cleaned up).

The hearing judge's conclusion that Neverdon assisted Lee in the unauthorized practice of law in violation of MARPC 5.5(a) is supported by clear and convincing evidence.  The evidence demonstrates that Neverdon not only assisted Lee in the unauthorized practice of law but also put Lee in a position to practice law in his absence.  Although Neverdon contends that Lee acted only at his direction, the hearing judge did not credit the contention and the evidence indicates otherwise.  For example, Lee met alone and communicated on his own with the Clients about signing the release from Nationwide.  Neverdon could not possibly have anticipated objections or questions from the Clients and instructed Lee in advance on how to respond.  When Purvey refused to sign the release, Lee had been meeting with the Clients alone and later, as the hearing judge observed, Neverdon "directed [] Lee to communicate directly with the Clients, even regarding legal issues, including those addressed in the September 6, 2017 letter."  The unauthorized practice of law does not require that a person engage in trial work but can include the giving of legal advice and the interpretation of legal documents.  There is ample evidence to support the hearing judge's conclusion that Neverdon assisted and, indeed, directed Lee to engage in the unauthorized practice of law.

### MARPC 8.1(a) (Bar Admission and Disciplinary Matters)

The hearing judge concluded that Neverdon violated MARPC 8.1(a) by making two false assertions in his October 10, 2018 letter to Bar Counsel—namely, that he filed

paperwork to open the Estate "as a courtesy" and that "Purvey failed to execute the release despite the Orphans' Court's directive at the March 19, 2018 hearing"—and false statements in his testimony about the Information Report at the hearing.

Neverdon excepts to the hearing judge's conclusion that he violated MARPC 8.1(a) and contends that the October 10, 2018 letter was not meant to mislead Bar Counsel. Neverdon argues that "in context, [he] clearly acknowledged that he was the attorney for the [E]state and not retained to act as the [personal representative] but did assist in preparing the forms for the co-[personal representatives]."  We sustain Neverdon's exception to the hearing judge's conclusions that he violated MARPC 8.1(a).[35]

MARPC 8.1(a) provides in pertinent part that an attorney "in connection with a disciplinary matter, shall not: [] knowingly make a false statement of material fact[.]" (Paragraph break omitted).

The hearing judge's conclusion that Neverdon violated MARPC 8.1(a) with respect to the two statements in the October 10, 2018 letter is not supported by clear and convincing evidence.  At oral argument in this Court, Bar Counsel contended that Neverdon falsely claimed that he opened the Estate "as a courtesy" when the hearing judge found that the Estate matter was within the scope of Neverdon's representation.  In the October 10, 2018 letter, Neverdon stated:

> [The Clients] each retained my services, respectively, to attempt to obtain a
> monetary settlement for the unfortunate demise of their late cousin, Rodney

---

[35]As explained above, Neverdon's alleged false testimony at the disciplinary hearing would not constitute a violation of MARPC 8.4(c) as the violation could not have been charged in the Petition for Disciplinary or Remedial Action and his testimony at the hearing would not violate MARPC 8.1(a) for the same reason.

Chase.  Stemming from the personal injury matter, an estate matter was associated.  I was not formally retained to handle the estate matter and act in the capacity of Personal Representative (PR), but rather, to help establish and open the estate.  I offered to serve as PR and explained some of the responsibilities associated.  However, [Purvey] was very adamant she understood and insisted upon serving instead.  From the inception, there were familial difficulties at which point, for the sake of compromise, [] Purvey and [] Michael [] agreed to serve as Co-Personal Representatives (Co-PR).  From the onset, this union was a difficult one; in which, I found myself as referee.  My office did, as a courtesy, open the estate for [Purvey] and further helped her and [Michael] when they failed to comply with one of the responsibilities of a PR.

To be sure, Neverdon's response lacks clarity and even appears inconsistent in some respects.  Nevertheless, the conclusion that Neverdon knowingly made a false statement of material fact is not supported by clear and convincing evidence.  In the letter, Neverdon acknowledges that he was retained to represent the Clients in connection with the personal injury matter and to help establish and open the Estate, but states that the Clients were adamant that he not serve as a personal representative.  Albeit Neverdon writing that he was retained to help establish and open the Estate, yet writing that he opened the Estate as a courtesy, is confusing but this cannot fairly be determined to be a knowingly made false statement.  Neverdon stating that he opened the Estate as a courtesy appears to be more his expression of the opinion that, because the Clients did not want him to serve as the personal representative, he was not obligated to open the Estate rather than a knowingly made false statement.  Where an attorney gives a response to Bar Counsel that is "more a matter of opinion than fact[,]" we have concluded that the attorney's statement does not form the basis of a violation of MARPC 8.1(a).  Attorney Grievance Comm'n v. Sperling, 472 Md. 561, 608, 248 A.3d 224, 251 (2021).  In this case, despite the imprecise language, it is

apparent from Neverdon's letter that he acknowledged that he had been retained to assist with the personal injury case as well as with establishing and opening the Estate. Under the circumstances, we decline to conclude that Neverdon's statement constitutes a violation of MARPC 8.1(a).

Addressing the hearing judge's next conclusion—that Neverdon falsely stated in the October 10, 2018 letter that Purvey failed to execute the release after the Orphans' Court's directive at the March 19, 2018 hearing—again, there is not clear and convincing evidence that Neverdon knowingly made a false statement of material fact.[36] In the conclusions of law, the hearing judge observed that Bar Counsel "asserted in its Petition that [Neverdon] made a false statement of material fact when he asserted in the October 10, 2018 letter that 'Ms. Purvey failed to execute the release despite the Orphans' Court's directive at the March 19, 2018 hearing.'" The hearing judge stated that, in the letter to Bar Counsel, Neverdon wrote: "I could only assume [] Purvey was now satisfied 'justice' was in progress; and now, she was comfortable with executing the Release; as coincidentally, she still had not done so, despite the Court's directive in open court." The hearing judge concluded by clear and convincing evidence that Neverdon's assertion had been false because the record was clear that Purvey had signed the release before the March 19, 2018 Orphans' Court hearing.

In the October 10, 2018 letter, Neverdon wrote:

---

[36]Although he excepts to the hearing judge's conclusion that he violated MARPC 8.1(a), Neverdon does not specifically address the conclusion that he made a false statement by stating that Purvey had failed to sign the release even though the Orphans' Court had allegedly ordered the release to be signed.

> A few weeks later, Office of the State's [A]ttorney for Anne Arundel county contacted my office in response to our ongoing inquiries by phone, to explain the Grand Jury decided to charge Mr. Disney, criminally, for the death of Rodney Chase.  Consequently, I sent correspondence to [Purvey] and all other persons of interest.  A few weeks following, claimant finally agreed to sign the Release, which was forwarded to Nationwide.  I could only assume [] Purvey was now satisfied "justice" was in progress; and now, she was comfortable with executing the Release; as coincidentally, she still had not done so, despite the Court's directive in open court.

In this portion of the letter, Neverdon communicated to Bar Counsel that Purvey eventually signed the release and gratuitously added that her signing of the release occurred after "the Court's directive in open court."  The issue is, of course, that there was no such directive by the Orphans' Court.  It is clear from the record though, that, on March 19, 2018, there had been a hearing in the Orphans' Court, during which the Court was advised that the release had already been signed but the settlement check had not been signed, and that Neverdon did not attend the hearing.  The Orphans' Court issued an order that the signed release and signed settlement check be filed with the Court by March 26, 2018.

At oral argument, in response to a question from the Court, Bar Counsel indicated that Neverdon should have known that the release would have been signed before the Orphans' Court hearing because the settlement check had been received in February 2018. Bar Counsel is correct that logic would dictate that Neverdon should have known that the release would have been signed prior to the issuance of the settlement check.  Nonetheless, we can discern no logical reason why Neverdon would attempt to deceive Bar Counsel into believing that the Orphans' Court had ordered Purvey to sign the release when it would be readily verifiable that the release had already been signed, that the Orphans' Court had been so advised, and that the Court's directive had been that the signed release and

settlement check be filed.

It seems more a matter of Neverdon, who had not attended the March 19, 2018 hearing before the Orphans' Court, in his October 10, 2018 letter mistakenly responded to Bar Counsel by gratuitously indicating that Purvey had not signed the release prior to the hearing, when in actuality it was the settlement check that had not been signed and the Orphans' Court had ordered that both the signed release and signed settlement check be filed with the court—not that Purvey sign the release.  Rather than making a knowing false statement of material fact, Neverdon's response to Bar Counsel seems to demonstrate a lack of competence in handling his own case.  Overall, clear and convincing evidence does not support the conclusion that Neverdon knowingly made a false statement of material fact where, in one instance, he appeared to give an opinion, and, in the second instance, he made an obvious misstatement of fact to Bar Counsel.[37]

### MARPC 8.4(d) (Conduct that is Prejudicial to the Administration of Justice)

The hearing judge concluded that Neverdon did not violate MARPC 8.4(d).  In concluding as much, the hearing judge indicated that an attorney's conduct rises to the level of a violation of MARPC 8.4(d) if it is "so egregious that it has a negative impact on the profession as a whole, leaving a bad mark on all of us."  (Cleaned up).  The hearing judge reasoned that Neverdon's conduct did not reach this level.  Bar Counsel excepts to the hearing judge's conclusion, and argues, among other things, that Neverdon violated MARPC 8.4(d) by failing to represent the Clients competently and diligently, notify third

---

[37]In light of our conclusion that Neverdon's conduct did not violate MARPC 8.1(a), the conduct necessarily also did not violate MARPC 8.4(c).

parties about the receipt of settlement funds, and create and maintain required records for his attorney trust account. Bar Counsel also asserts that Neverdon violated MARPC 8.4(d) by assisting Lee in the unauthorized practice of law. We sustain Bar Counsel's exception.

"It is professional misconduct for an attorney to . . . engage in conduct that is prejudicial to the administration of justice[.]" MARPC 8.4(d). "Generally, a lawyer violates M[A]RPC 8.4(d) where the lawyer's conduct would negatively impact the perception of the legal profession of a reasonable member of the public." Attorney Grievance Comm'n v. Slate, 457 Md. 610, 645, 180 A.3d 134, 155 (2018) (cleaned up).

Neverdon violated MARPC 8.4(d) in a variety of ways. Neverdon allowed Lee to run his law office virtually unsupervised and to engage in the unauthorized practice of law. The Clients were sent letters containing incorrect legal information. Neverdon failed to maintain adequate communication with the Clients. For example, Neverdon did not inform the Clients about the status of the investigation of their case at the time that the settlement offer was presented. Neverdon failed to recognize a conflict of interest that developed when Purvey refused to settle and, as such, failed to advise any of the Clients of the conflict of interest or attempt to obtain informed consent to continue representing them. Neverdon failed to notify lienholders of the receipt of settlement proceeds and failed to create and maintain records concerning the disbursement of proceeds in his attorney trust account related to the case. Although we have concluded that Neverdon did not engage in intentional dishonesty, nonetheless, Neverdon engaged in a variety of misconduct that the public would not expect from a member of the legal profession and that would negatively impact the perception of the legal profession of a reasonable member of the public.

## MARPC 8.4(a) (Violating the MARPC)

The hearing judge concluded that Neverdon violated MARPC 8.4(a).

"It is professional misconduct for an attorney to[] violate . . . the" MARPC. MARPC 8.4(a).  Clear and convincing evidence supports the hearing judge's conclusion that Neverdon violated MARPC 8.4(a).  As discussed above, Neverdon violated MARPC 1.1, 1.2(a), 1.3, 1.4(a)(2) and (b), 1.7, 1.15(a) and (d), 1.16(a)(1), 5.3(b), 5.5(a), and 8.4(d).

### (C) Aggravating and Mitigating Factors

The hearing judge found six aggravating factors.  First, the hearing judge found that Neverdon's misconduct was aggravated by prior discipline.  Over objection, the hearing judge admitted an exhibit from Bar Counsel—a letter dated November 15, 2016 from Bar Counsel to the Clerk of this Court which enclosed a letter dated September 28, 2016 from Bar Counsel to Neverdon confirming that the Attorney Grievance Commission had approved an agreed-upon reprimand.  The September 28, 2016 letter referenced four separate complainants and that Neverdon agreed to a reprimand for violations of MLRPC 1.2, 1.3, 1.15(a), (c), and (d), 1.16, and 8.4 and Maryland Rule 16-604.

Second, the hearing judge found that Neverdon's misconduct was aggravated by multiple violations of the MARPC.

Third, the hearing judge found that Neverdon's misconduct was aggravated by the submission of false evidence during the disciplinary process.  According to the hearing judge, two of the assertions in Neverdon's October 10, 2018 letter to Bar Counsel and his testimony about the Information Report at the disciplinary hearing constituted the submission of false evidence during the disciplinary process.

- 75 -

Fourth, the hearing judge found that Neverdon's misconduct was aggravated by substantial experience in the practice of law, as, at the time of the hearing, Neverdon had been practicing law for twenty-one years and had been handling sixteen to twenty personal injury cases each month during the relevant time period.

Fifth, the hearing judge found that Neverdon's misconduct was aggravated by an indifference to making restitution. According to the hearing judge, Neverdon had taken his attorney's fee before completing the work he was required to perform and, at the hearing, Neverdon admitted that he did not consider refunding any of his attorney's fee. The hearing judge stated: "For all practical purposes, it is impossible to determine how much of the fee has been earned at this point, so the proper thing would have been for [Neverdon] to return the fee to his trust account until the entire matter was concluded. [Neverdon] has not indicated any intention of doing that."

Sixth, the hearing judge found the aggravating factor of a refusal to acknowledge the wrongful nature of the misconduct. Specifically, the hearing judge found that Neverdon failed to acknowledge the wrongful nature of his misconduct with respect to the manner in which he inadequately investigated the survival action, handled the liens on the Estate, and advised the Clients on how to manage and close the Estate. The hearing judge stated that, during the disciplinary hearing, Neverdon acknowledged that his handling of the survival action may not have been the "gold standard[,]" but that he had done what he believed to be necessary and appropriate, and Neverdon contended that he was still negotiating the liens and assisting the Clients with the Estate, as demonstrated by the letter he sent to MDH on September 17, 2020. According to the hearing judge, Neverdon's representation in the

survival action fell "far below the 'gold standard'" and Neverdon's failure to acknowledge "his deficient handling" of the matter demonstrated a refusal to acknowledge the wrongful nature of the misconduct.

In addition, the hearing judge found that, although handling the CEICO lien was within the scope of the representation, Neverdon had done nothing concerning the lien. The hearing judge also found that, other than the September 17, 2020 e-mail to MDH, there had been no work on the Estate or communication between Neverdon and the Clients since January 7, 2019.  The hearing judge determined that the only reason Neverdon reached out to MDH on September 17, 2020 was because he discovered "a new theory for arguing that MDH's lien could be reduced during the deposition of" Bar Counsel's expert.

In contrast, the hearing judge declined to find three other aggravating factors suggested by Bar Counsel.  The hearing judge found that Bar Counsel had failed to establish that Neverdon's misconduct was aggravated by a dishonest or selfish motive, a pattern of misconduct, or the vulnerability of the victim (Purvey).

The hearing judge found no mitigating factors, stating that Neverdon "did not assert that any mitigating factors were present in th[e] case."

### (D) Sanction

Bar Counsel recommends that Neverdon be indefinitely suspended from the practice of law.  In his exceptions and recommendation for sanction, Neverdon does not expressly recommend a sanction but instead provides a list of actions from the last two fiscal years, in which attorneys have been reprimanded by consent or reprimanded by the Commission. At oral argument, when asked about the recommended sanction, Neverdon's counsel stated

that this case involved some "missteps" by Neverdon of the type for which this Court usually reprimands attorneys.

In <u>Slate</u>, 457 Md. at 646-47, 180 A.3d at 155-56, this Court stated:

This Court sanctions a lawyer not to punish the lawyer, but instead to protect the public and the public's confidence in the legal profession.  This Court accomplishes these goals by: (1) deterring other lawyers from engaging in similar misconduct; and (2) suspending or disbarring a lawyer who is unfit to continue to practice law.

In determining an appropriate sanction for a lawyer's misconduct, this Court considers: (1) the M[A]RPC that the lawyer violated; (2) the lawyer's mental state; (3) the injury that the lawyer's misconduct caused or could have caused; and (4) aggravating factors and/or mitigating factors.

Aggravating factors include: (1) prior attorney discipline; (2) a dishonest or selfish motive; (3) a pattern of misconduct; (4) multiple violations of the M[A]RPC; (5) bad faith obstruction of the attorney discipline proceeding by intentionally failing to comply with rules or orders of the disciplinary agency; (6) submission of false evidence, false statements, or other deceptive practices during the attorney discipline proceeding; (7) a refusal to acknowledge the misconduct's wrongful nature; (8) the victim's vulnerability; (9) substantial experience in the practice of law; (10) indifference to making restitution or rectifying the misconduct's consequences; (11) illegal conduct, including that involving the use of controlled substances; and (12) likelihood of repetition of the misconduct.

Mitigating factors include: (1) the absence of prior attorney discipline; (2) the absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith efforts to make restitution or to rectify the misconduct's consequences; (5) full and free disclosure to Bar Counsel or a cooperative attitude toward the attorney discipline proceeding; (6) inexperience in the practice of law; (7) character or reputation; (8) a physical disability; (9) a mental disability or chemical dependency, including alcoholism or drug abuse, where: (a) there is medical evidence that the lawyer is affected by a chemical dependency or mental disability; (b) the chemical dependency or mental disability caused the misconduct; (c) the lawyer's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and (d) the recovery arrested the misconduct, and the misconduct's recurrence is unlikely; (10) delay in the attorney discipline

proceeding; (11) the imposition of other penalties or sanctions; (12) remorse; (13) remoteness of prior violations of the M[A]RPC; and (14) unlikelihood of repetition of the misconduct.

(Cleaned up).

Neverdon excepts to the hearing judge's finding of the aggravating factors of submission of false evidence during the disciplinary process, refusal to acknowledge the wrongful nature of his conduct, substantial experience in the practice of law, and indifference to making restitution.

We sustain Neverdon's exception to the hearing judge's finding of the aggravating factor of submission of false evidence during the disciplinary process. In light of our conclusion that Neverdon did not knowingly make false statements in his October 10, 2018 letter responding to Bar Counsel, we sustain Neverdon's exception to the finding based on his response to Bar Counsel. As to the hearing judge's finding that the aggravating factor applies based on Neverdon's testimony at the disciplinary hearing, the hearing judge appears to fault Neverdon for testifying that he believed Lee's denial of forging Purvey's signature on the Information Report. In this case, the hearing judge found that Neverdon should have known as of September 19, 2018, upon his receipt of the complaint from Bar Counsel, that Purvey's signature was a forgery. As we explained above, when Neverdon received the complaint in September 2018, he would have been aware at most of the allegation that Purvey's signature was forged.[38] In light of this, we sustain Neverdon's

---

[38]In discussing Neverdon's alleged false testimony, the hearing judge relied on Attorney Grievance Comm'n v. McClain, 406 Md. 1, 956 A.2d 135 (2008), for the proposition that Neverdon knew or should have known that his testimony was false, *i.e.*,

exception in its entirety.

We sustain Neverdon's exception to the hearing judge's finding of the aggravating factor of refusal to acknowledge the wrongful nature of his conduct. The hearing judge's finding appears to be based on Neverdon indicating, during the hearing, that his conduct fell below the "gold standard," and the hearing judge's determination that this testimony was insufficient to acknowledge the wrongfulness of his conduct. The hearing judge's finding suggests that this aggravating factor should apply because Neverdon attempted to point out that he has done some things correctly and that, in stating that his conduct fell below the "gold standard," Neverdon did not admit the violations. Under this standard, the refusal to acknowledge the wrongful nature of the conduct would routinely apply as an aggravating factor to almost every attorney who testified on their own behalf at a disciplinary hearing.

We overrule Neverdon's exception to the hearing judge's finding of the aggravating factor of substantial experience in the practice of law. Neverdon contends that he testified that, although he has substantial experience with personal injury cases, he "conceded that he had limited experience in the matters of estate law[.]" Nonetheless, Neverdon was admitted to the Bar of Maryland in 1999. At the time that Neverdon began representing

---

Neverdon should have known that Lee forged Purvey's signature upon receipt of the complaint. The circumstances of McClain are distinguishable. In McClain, 406 Md. at 14, 18, 956 A.2d at 143, 145, we concluded that an attorney violated MLRPC 3.3(a) where the attorney knowingly misrepresented to the court that settlement in a sale of land had occurred and the attorney provided misleading statements that he attributed to a trial judge. We determined that the attorney knew or should have known that his interpretation of the trial judge's statements was false. See id. at 14, 956 A.2d at 143. The circumstances of McClain are nothing like those in this case.

the Clients in 2017, he had approximately eighteen years of experience overall as an attorney.

We sustain Neverdon's exception to the hearing judge's finding of the aggravating factor of indifference to making restitution.  The hearing judge based the finding on the circumstance that Neverdon took his full fee before completing the work that he was obligated to perform, that he has never returned the fee, and that the proper thing would have been for Neverdon to return the fee to his attorney trust account until the matter was concluded.  Although Bar Counsel's expert, Bekman, testified that Neverdon's receipt of a $10,000 fee was unreasonable, Neverdon was not charged in the Petition for Disciplinary or Remedial Action with a violation of MARPC 1.5(a), which concerns charging an unreasonable fee.  Because Neverdon was not charged with violating MARPC 1.5(a), we did not sustain the hearing judge's conclusion that he charged an unreasonable fee in violation of the rule.  As such, despite Bekman's testimony having merit, there is no ground on which to sustain the hearing judge's determination that the fee was required to be returned to the Clients in the form of restitution.

Bar Counsel's sole exception is to the hearing judge's failure to find as an aggravating factor that Purvey was a vulnerable victim.  We overrule the exception.  Bar Counsel argues that the hearing judge erred in failing to find the factor due to lack of proof that Neverdon "preyed on" Purvey.  Bar Counsel contends that it is not required to prove that Neverdon "preyed on" Purvey.  In support of the contention, Bar Counsel cites Attorney Grievance Commission cases in which clients who were either a criminal defendant or an immigrant were found to be vulnerable victims.  See Attorney Grievance

Comm'n v. Singh, 464 Md. 679, 212 A.3d 888 (2019); Attorney Grievance Comm'n v. Patton, 432 Md. 359, 69 A.3d 11 (2013).

In addition, Bar Counsel draws our attention to Attorney Grievance Comm'n v. Robbins, 463 Md. 411, 467, 205 A.3d 1034, 1066 (2019), a case in which the hearing judge found that one of the attorney's clients "was a vulnerable client due to her old age and dementia diagnosis." In Robbins, 463 Md. at 463-65, 468, 205 A.3d at 1064-65, 1066-67, there were multiple clients for whom the attorney had handled estate matters and the attorney violated MARPC 1.1, 1.2, 1.3, 1.4, 1.5, 1.7, 8.1(a), and 8.4(c), (d), and (a). We concluded that disbarment was the appropriate sanction and stated that, in a previous case, we had determined that an "attorney's behavior was especially troubling given that his chosen prey were the elderly and their families, vulnerable people who sought the attorney's assistance in alleviating their difficult circumstances." Id. at 467-68, 205 A.3d at 1066 (cleaned up). We reaffirmed that "sentiment and note[d] that [the attorney's] inclination to prey on the elderly [was] particularly heinous." Id. at 468, 205 A.3d at 1066.

Here, in its exceptions, while providing case law and arguing that it need not prove that Neverdon preyed upon Purvey, Bar Counsel does not expressly explain why Purvey should be considered a vulnerable victim, *i.e*., why the aggravating factor is applicable. It appears that Bar Counsel predicates the exception on Purvey's age. The hearing judge stated that Purvey was 93 years old at the time of the disciplinary hearing and that, during the hearing, she exhibited some difficulty in hearing, understanding questions, and relaying information. Nonetheless, the hearing judge pointed out that Purvey was but one of a group of four people that Neverdon represented and that the other three individuals were much

younger and that Purvey had the assistance of "friends and family members" during the representation.  In <u>Robbins</u>, 463 Md. at 441, 205 A.3d at 1051, the client who was found to be a vulnerable victim, in addition to being of advanced age (88 years old), suffered from a myriad of conditions, "including aphasia causing her speech to be impaired; mild dementia; short term memory loss; and inability to recall amounts, dates, and, eventually, to write checks."  Certainly the aggravating factor of vulnerable victim may apply without affirmative evidence that an attorney preyed on a particular person or group of people.  In this case, though, in assessing the applicability of the vulnerable victim aggravating factor, the hearing judge noted Purvey's age and observed only that she had some difficulty during the disciplinary hearing.  Under the circumstances, we decline to disturb the hearing judge's finding that the aggravating factor of vulnerable victim does not apply.

In sum, after carefully reviewing the hearing judge's findings and Neverdon's and Bar Counsel's exceptions, we conclude that the following aggravating factors apply: substantial experience in the practice of law, prior attorney discipline, and multiple violations of the MARPC.

Neverdon excepts to the hearing judge's failure to find any mitigating factors and contends that there are four such factors.  Neverdon contends that any misconduct is mitigated by the following: (1) the circumstance that he has not abandoned the Clients and has continued to work to negotiate a reduction of the liens; (2) his testimony acknowledging a "shortfall in his representation"; (3) his assertion that he is contrite concerning the use of Lee in his practice and that he has "revamped his office procedures"; and (4) that he has terminated his employment with the State and returned to work full time

in his practice.  Neverdon appears to be contending that the mitigating factors of timely good faith efforts to make restitution or to rectify the misconduct's consequences, remorse, and unlikelihood of repetition of the misconduct are present.  From our perspective, the information Neverdon provides in his exception is insufficient to establish a basis for the mitigating factors.  We agree with the hearing judge's determination that no mitigating factors apply.

In Attorney Grievance Comm'n v. Barton, 442 Md. 91, 150, 144, 110 A.3d 668, 702, 699 (2018), a case relied on by Bar Counsel, this Court indefinitely suspended an attorney who violated MARPC 1.1, 1.3, 1.4(a) and (b), 1.5(a), 1.15(a) and (b), 1.16(d), 5.3(a), (b), and (c), 5.5(a), and 8.4(a), (c), and (d).  The attorney had engaged in "a pattern of client neglect and a failure to properly supervise nonlawyer employees and include[d] an instance of misrepresentation before a court." Id. at 148, 110 A.3d at 701.  Significantly, the attorney "engaged in a misrepresentation to the Bankruptcy Court by failing to disclose [] additional compensation she received from" a client.  Id. at 149, 110 A.3d at 702.  This Court noted five aggravating factors, including a dishonest or selfish motive, a pattern of misconduct, multiple violations, a refusal to acknowledge the wrongful nature of the misconduct, and an indifference to making restitution.  See id. at 145, 110 A.3d at 700. We noted two mitigating factors, including interim rehabilitation because, among other things, the attorney had undertaken cases pro bono involving purported victims of her law firm's office manager, and the absence of prior discipline.  See id. at 147, 104, 110 A.3d at 701, 675-76.  We concluded that, in the absence of any finding of misappropriation, an indefinite suspension was the appropriate sanction.  See id. at 150, 110 A.3d at 702.

In <u>Attorney Grievance Comm'n v. Dore</u>, 433 Md. 685, 689, 727, 73 A.3d 161, 163, 186 (2013), where an attorney failed to properly supervise employees and authorized the employees to regularly sign his name on affidavits filed in foreclosure actions, and where the employees also notarized the false signatures, this Court suspended the attorney for ninety days.  The attorney violated MLRPC 3.3(a)(1), 5.3(a)(1), and 8.4(d) by making false statements to a tribunal, failing to supervise non-attorney assistants, and engaging in conduct prejudicial to the administration of justice.  <u>See</u> <u>id.</u> at 718, 73 A.3d at 180.  In concluding that a ninety-day suspension was the appropriate sanction, we noted that we refrained from imposing an indefinite suspension because there were many mitigating circumstances.  <u>See</u> <u>id.</u> at 727, 73 A.3d at 186.

In <u>Attorney Grievance Comm'n v. Hallmon</u>, 343 Md. 390, 394-95, 406-10, 681 A.2d 510, 512, 518-20 (1996), where an attorney assisted an unlicensed law school graduate in the unauthorized practice of law by failing to adequately supervise the graduate, and failed to respond to Bar Counsel and to maintain an attorney trust account, we suspended the attorney for ninety days.  The attorney violated MLRPC 5.5 and 8.1(b), as well as various statutes related to the maintenance of an attorney trust account.  <u>See</u> <u>id.</u> at 393-94, 407-09, 681 A.2d at 512, 518-20.  We required that the termination of the attorney's suspension be subject to the attorney's satisfaction of certain conditions, including completion of courses on the rules of professional conduct and law office management, and the engagement, at the attorney's expense, of an attorney monitor acceptable to Bar Counsel to oversee the attorney's practice.  <u>See</u> <u>id.</u> at 411, 681 A.2d at 520-21.

Recently, in Attorney Grievance Comm'n v. Fineblum, ___ Md. ___, ___ A.3d ___, 2021 WL 1604340, *1-2, 19 (2021), where, among other things, for a period of approximately ten years, an attorney engaged in misconduct involving the lack of supervision of a paralegal firm to which he regularly delegated work, improperly shared fees with the paralegal firm, and failed to properly manage his attorney trust account, this Court suspended the attorney for six months and a day with reinstatement conditioned on the attorney engaging an attorney monitor for a period of three months.  The attorney violated MARPC 1.4(b), 1.15(a) and (b), 5.3(a) and (b), 5.4(a) (Professional Independence of an Attorney), 5.5(a), and 8.4(a) and (d), as well as Maryland Rules 19-407(a)(3), (a)(4), and (b) (Attorney Trust Account Record-Keeping) and 19-408 (Commingling Funds).  See id. at *8-14.  We observed that the attorney's misconduct was mitigated by several factors, including lack of prior attorney discipline, the absence of a dishonest or selfish motive, timely good faith efforts to make restitution or to rectify the misconduct's consequences, and character or reputation.  See id. at *16.  In determining that the appropriate sanction was a suspension of six months and a day, we concluded that the attorney's misconduct was more similar to the misconduct of the attorneys in Dore and Hallmon, where the attorneys received definite suspensions, than to Barton, where the attorney was indefinitely suspended.  See id. at *18.

Likewise, we determine that Neverdon's misconduct is more akin to the misconduct of the attorneys in Dore, Hallmon, and Fineblum, and distinct from that of the attorney in Barton, who had engaged in intentional dishonesty.  We conclude that the appropriate sanction for Neverdon's misconduct is a suspension from the practice of law in Maryland

for six months, and that his reinstatement be conditioned upon the engagement of an attorney monitor for a period of one year following the date of reinstatement to ensure that he practices law in accordance with all applicable rules and regulations.  The monitor must be approved by Bar Counsel and shall be engaged at Neverdon's expense.  Neverdon has violated numerous MARPC, namely, MARPC 1.1, 1.2(a), 1.3, 1.4(a)(2) and (b), 1.7, 1.15(a) and (d), 1.16(a)(1), 5.3(b), 5.5(a), 8.4(d), and 8.4(a).  But for the circumstance that this case does not involve intentional dishonesty or knowingly making false statements of material fact in violation of MARPC 3.3(a)(1), 8.1(a), or 8.4(c), Bar Counsel's recommendation of an indefinite suspension from the practice of law would have been warranted.

Even in the absence of intentional dishonesty and knowingly made false statements, the circumstances of Neverdon's misconduct warrant the sanction of a suspension sufficient to deter other attorneys from engaging in similar misconduct and to protect the public.  The Clients in this case entrusted an estate matter to Neverdon at a time when they had incurred the loss of a loved one and relied upon him to handle the case appropriately. Neverdon allowed the matter to be handled, for the most part, by a non-attorney assistant and did not give the matter competent or diligent attention.  Given the presence of the aggravating factors of substantial experience in the practice of law, multiple violations, and prior attorney discipline in the form of a reprimand by the Commission and the lack of mitigating factors, a suspension from the practice of law for a period of six months with the condition of engagement of a monitor upon reinstatement is the appropriate disposition. Unlike the attorney in <u>Fineblum</u>, who also delegated responsibilities to those he failed to

adequately supervise, Neverdon failed to handle his Clients' matter competently and diligently and has a prior Commission reprimand and no mitigating factors.  On the other hand, the misconduct in <u>Fineblum</u> spanned a period of approximately ten years and consisted of numerous client matters in which the attorney failed to provide adequate supervision to the paralegal firm involved and failed to properly manage his attorney trust account and commingled funds.  On balance, taking into account the differences and similarities between the two cases, we conclude that a comparable sanction is warranted.

For all of the reasons explained above, we suspend Neverdon from the practice of law for six months with the condition of engagement of an attorney monitor for a one-year period upon reinstatement to the practice of law in Maryland.  The suspension shall commence thirty days after the date on which this opinion is filed.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 19-709(d), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST RUSSELL A. NEVERDON, SR.**